Filed 5/4/21  Menefee Construction v. Vulcan Materials Co. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MENEFEE CONSTRUCTION et al., | F075382 |
| Plaintiffs, Cross-defendants and Appellants, | (Super. Ct. No. 11CECG01702) |
| v. | |
| VULCAN MATERIALS COMPANY, | **OPINION** |
| Defendant, Cross-complainant and Respondent. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi C. Kapetan, Judge.

Jerry H. Mann; Baker Manock & Jensen, and Daniel C. Stein, for Plaintiffs, Cross-defendants and Appellants.

Haight Brown & Bonesteel, William O. Martin, Jr., and Vangi M. Johnson, for Defendant, Cross-complainant and Respondent.

-ooOoo-

Appellants Menefee Construction, Western Surety Company, Jerry Menefee, Douglas Menefee, and Rodney Menefee (collectively, Menefee) appeal a judgment entered by the Fresno County Superior Court in favor of Calmat Co., dba Vulcan Materials Company – Western Division (Vulcan). This case arose from two public works asphalt concrete (AC) paving projects, namely the Overlays Project and the Academy Project, that Menefee performed for Fresno County, in 2009 and 2010, respectively. Vulcan supplied the AC for both projects to Menefee. The matter proceeded to trial on a third amended complaint (complaint) filed by Menefee against Vulcan, and on a cross-complaint filed by Vulcan against Menefee. The only claim at issue in Menefee's complaint, for purposes of trial, was fraud based on intentional misrepresentations. Vulcan's cross-complaint was essentially a breach of contract action seeking payment for AC it had supplied to Menefee. The superior court entered judgment, on Menefee's complaint, in favor of Vulcan and against Menefee. On Vulcan's cross-complaint, the superior court also entered judgment in favor of Vulcan and against Menefee. We affirm the superior court's judgment on Menefee's complaint and reverse the judgment on Vulcan's cross-complaint.

## PROCEDURAL HISTORY

Menefee's operative third amended complaint asserted eight causes of action: (1) breach of contract; (2) fraud based on intentional misrepresentations as to the provision of asphalt concrete or AC for both the Overlays and Academy Projects; (3) negligent misrepresentation; (4) negligence; (5) declaratory relief; (6) breach of fiduciary duty; (7) breach of fiduciary duty/failure to use reasonable care by agent; and (8) breach of duty of loyalty based on agency. As to the intentional misrepresentation (fraud) causes of action, Menefee sought damages "in the sum of $500,000.00 and according to proof," as well as "punitive damages."

2.

Vulcan filed motions for summary adjudication on each of Menefee's causes of action and all were granted except for those regarding the intentional misrepresentation claims (as to both projects), which survived (along with the claim for declaratory relief). The intentional misrepresentation claims were based, as to the Overlays Project, on a representation about the specifications of the AC that Vulcan was to provide for that project, and as to the Academy Project, on a representation about the specifications of the AC that Vulcan was to provide for the latter project (as to the Academy Project, there was also a dispute regarding the agreed-upon price of the AC from one of Vulcan's plants).

Meanwhile, Vulcan had also filed a cross-complaint against Menefee and Fresno County;[1] the cross-complaint was related to the Academy Project only. Vulcan's cross-complaint raised claims of breach of written contract (i.e., a preexisting credit agreement that Menefee and Vulcan entered into in 2005 based on Menefee's credit application); breach of contract for goods and materials furnished; an open book account; account stated; breach of contract on personal guaranty; breach of contract on public works payment bond; and breach of contract on stop notice. The cross-complaint alleged that as the prime contractor for the Academy project, Menefee purchased materials from Vulcan for which it failed to make full payment. Vulcan sought a principal sum of $1,159,797.05 in the cross-complaint. As to Vulcan's cross-complaint, Menefee filed an answer asserting a general denial and 17 affirmative defenses, including willful misconduct of another, obligation extinguished by performance, estoppel, unclean hands, and offset.

Prior to trial, Vulcan filed a motion to bifurcate the trial into separate liability and damages phases, which motion was granted by the court.

---

[1] Although the cross-complaint was filed against Menefee as well as Fresno County (County), the County was eventually discharged from the cross-complaint pursuant to stipulation of the parties and order of the court.

The matter proceeded to jury trial. The liability phase of the trial began on May 10, 2016. On May 25, 2016, the jury rendered verdicts in favor of Menefee on the fraud causes of action related to both the Overlays Project and the Academy Project. The damages phase of the trial began on May 31, 2016. The court struck the testimony of Menefee's expert witness on damages, John Heberger, who testified to Menefee's alleged damages, in the form of business losses, ostensibly related to Vulcan's misrepresentation as to the Overlays Project. The court also had significant concerns related to the testimony of Menefee's only other witness in the damages phase, namely Mike Menefee (Menefee Construction's field superintendent and estimator), who testified to Menefee's alleged damages in connection with Vulcan's misrepresentation as to the Academy Project. The court struck a key, proposed exhibit underlying Mike Menefee's testimony, and, in turn, Mike Menefee's testimony as well. Vulcan moved for nonsuit on Menefee's fraud/intentional misrepresentation claims for damages. The trial court granted the motion for nonsuit and discharged the jury.

On June 8-9, 2016, the matter of Vulcan's cross-complaint proceeded to trial before the court. Vulcan waived its right to a jury trial but Menefee objected to the court's decision to try the cross-complaint itself, rather than holding a jury trial. Both sides presented witness testimony and submitted closing briefs. On October 26, 2016, the court issued a statement of decision in favor of Vulcan on all causes of action in the cross-complaint. The court awarded Vulcan $1,159,797.05 in contract damages (the outstanding amount owed to Vulcan for supplying AC for the Academy Project). More specifically, the court ruled: "Vulcan is entitled to the $900,000.00 interpled by the County of Fresno pursuant to Vulcan's stop notice. The $900,000 will operate as a set off to the amount owed by Menefee[,] leaving $259,797.05 owing to Vulcan from Menefee."

Judgment was entered on January 18, 2017.

# FACTUAL BACKGROUND

**Introduction**

Menefee called six witnesses at trial: Jerry Menefee (partner/owner of Menefee Construction),[2] Rodney Menefee (partner/owner of Menefee Construction),[3] Mike Menefee (field superintendent and estimator for Menefee Construction), Marcos Galaviz (Vulcan sales representative), Aaron Godfrey (Vulcan technical service specialist), and Mark Horn (Menefee's AC expert). Vulcan also called six witnesses: Marcos Galaviz (Vulcan sales representative), Judy Munsey (dispatcher at Vulcan's Sanger plant), Erle Hogue (foreman at Vulcan's Fresno plant), Donald Powell (manager of a Bakersfield oil refinery from which Vulcan sourced its asphalts), Robert Staugaard (owner of an independent "testing laboratory for asphalts and asphalt mixes"), and Michael Boyd Robinson (Vulcan's AC expert). Neither side called as a witness any person who had been involved with the Overlays and Academy Projects on behalf of Fresno County.

Menefee Construction, a "general contracting" business, was owned by partners Jerry, Douglas, and Rodney Menefee. In 2009, Menefee Construction was chosen, being the lowest bidder, as the contractor for two separate public works projects for the County of Fresno (County). Vulcan served as Menefee Construction's AC supplier for both projects.

The Overlays Project involved the placement of a new layer of AC over the existing pavement on several County roads, both in mountainous areas and in the valley flatlands. More specifically, the Overlays Project encompassed four roads in the mountains and four in the valley. An AC overlay entails the application of two "lifts" of AC on top on an existing road. Work on the Overlays Project began in July 2009 and ended in October 2009.

---

[2] Jerry Menefee was the father of Mike, Douglas, and Rodney Menefee.

[3] Rodney Menefee testified in Menefee's case-in-chief and was the only witness in Menefee's rebuttal case.

The second project, the Academy Project, was also awarded in 2009, but construction began after completion of the Overlays Project, in the spring of 2010, and continued over the rest of that year and into the beginning of 2011. The Academy Project mainly involved the widening, re-construction, and paving of Academy Avenue for a stretch of approximately six miles.

Menefee Construction had a preexisting relationship with Vulcan and obtained quotes for AC for both projects from Vulcan, which quotes were configured into Menefee Construction's project bid amounts.[4] Thereafter, Menefee Construction hired Vulcan as its AC materials supplier for both projects. Vulcan had two AC plants in the area: one in Fresno (near Woodward Park) and one in Sanger. The Fresno plant was a continuous plant and produced AC containing Recycled Asphalt Pavement (RAP). The Sanger plant was a batch plant and did *not* produce AC with RAP. The Fresno plant produced approximately 4,500 tons of AC per day, while the Sanger plant produced around 2,500 tons of AC per day. Menefee intended to use AC from both Vulcan plants on both projects, but more from the Fresno plant because of its higher capacity. Menefee bid both the Overlays and Academy projects at approximately the same time, about "a couple of weeks" apart in June 2009.

Menefee's project contracts with the County for the Overlays Project and the Academy Project required that the AC material used on the projects comply with section 39 of the 2006 version of Caltrans Standard Specifications (2006 Caltrans Specifications).[5] Specifically, each contract provided, in relevant part: "The work embraced herein shall be done in accordance with the Standard Specifications dated May 2006 and all amendments thereto issued or updated on or prior to February 2, 2007; and

---

[4]     Menefee Construction is also interchangeably referred to as Menefee.

[5]     Menefee's expert witness, Mark Horn, testified that Section 39 of the Caltrans Specifications is the part of these specifications that deals with asphalt concrete.

6.

with the Standard Plans dated May 2006, of the State of California, Department of Transportation insofar as the same may apply and in accordance with the following special provisions. [¶] … [¶] In case of conflict between the Standard Specifications and these special provisions, the special provisions shall take precedence over and be used in lieu of such conflicting provisions."

Mike Menefee explained the significance of the special provisions: "The special provisions make changes. We have a standard specifications that we work by, it is like a standard set of rules. Right? The special provisions actually change or amend the standard rules. No job's the same.… So if you don't review the special provisions, you don't know what changes they have made to the standard specifications." The contracts, under the special provisions, allowed for the use of Recycled Asphalt Pavement (RAP) in the AC used on the projects; RAP is basically crushed chunks of old road pavement. Specifically, the provisions permitting use of RAP provided that "[t]he Contractor may substitute RAP for a portion of the virgin aggregate in asphalt concrete in an amount not exceeding 15 percent of the asphalt concrete dry aggregate mass."

In the case of the Overlays Project contract, the special provision permitting use of RAP was contained in an addendum to the initial contract. Mike Menefee testified that after that addendum came out for the Overlays Project, Marcos Galaviz, Vulcan salesman, commented that Fresno County was making changes to various jobs to allow for the use of RAP material. The addendum permitting the use of RAP required the contractor to conduct various tests in creating a RAP AC mix design and to submit a proposed RAP AC mix design in writing to the County's engineer;[6] the addendum

---

**6** Expert testimony revealed that asphalt production starts with the creation of an AC mix design, which is backed by a significant amount of testing, especially when the mix design incorporates RAP. Witnesses analogized the AC mix design to a recipe for baking a cake, with the AC recipe calling for combining appropriate amounts of rock (aggregate), sand, and oil.

7.

provided that AC production using RAP could not begin until the County approved the proposed mix design. The Academy Project contract contained similar special provisions. In short, with regard to RAP AC, the contracts for both the Overlays and Academy Projects required Menefee, as the projects' contractor, to submit proposed AC mix designs to the County, with backup test data, so that the County could verify and approve the mix designs for the AC that would be used on the projects. Menefee was not equipped to perform these steps itself and believed the asphalt supplier ultimately hired for the projects would implement them.

As for the 2006 Caltrans Specifications referenced in the contracts, the evidence showed that the 2006 Caltrans Specifications did not comprehensively address RAP AC; rather RAP AC was addressed by later versions of the Caltrans Standard Specifications. Menefee's expert witness on AC production, Mark Horn, testified that RAP AC, as a category, was not compatible with all aspects of the 2006 Caltrans Specifications. Similarly, Michael Boyd Robinson, Vulcan's expert on RAP AC testified that the 2006 Caltrans Specifications did not address RAP AC. Aaron Godfrey, Vulcan's technical service specialist, also testified that the 2008/2009 versions of the Caltrans Specifications (rather than the 2006 version) addressed RAP AC.[7] Godfrey and the expert witnesses explained that the 2006 Caltrans Specifications were different from subsequent versions in significant respects, while the 2008, 2009, and 2010 versions of the Caltrans Specifications were very similar or essentially interchangeable. Caltrans made a major update to the Standard Specifications after 2006; initially Caltrans implemented the

---

[7] Godfrey testified that the 2008 and 2009 versions of the Caltrans Specifications were referred to interchangeably.

update through special provisions on some Caltrans projects and eventually updated Section 39 of the Standard Specifications, including on June 25, 2009.**8**

Vulcan's expert witness on production and use of AC, Michael Boyd Robinson testified: "[T]ypically under the 2006 specification, Caltrans provided the mix design. They developed the mix design. The contractor would propose the aggregates, the blend and Caltrans would put it together, determine asphalt content and then order the contractor to produce accordingly. So we never produced any mix designs in accordance with the 2006 specifications that I recall, because Caltrans did them." Mark Horn, Menefee's expert witness on production and use of AC, testified in a similar vein: "[In] 2006, Caltrans did all the designs. We just basically gave them, here's some rock, here's some sand, here's some oil [asphalt] that we're going to buy from a certain refiner and have at it. Design it. [¶] … [¶] Well, the RAP changed everything. What that did is, Caltrans got out of the business of designing. They don't do designs anymore. And what that did is that put the pressure back onto the contractor." Horn was aware of an instance, however, where the agency in question, i.e., Los Angeles County, did its own RAP AC mix design (the contractor did not have to do it). Aaron Godfrey, Vulcan technician, similarly testified that, had the instant projects been Caltrans projects, Vulcan would have had to run the RAP AC tests itself or hire a third party to conduct the RAP mix design testing necessary to submit the mix design test data to the agency for verification. Godfrey explained that, unlike Caltrans, in this instance the County wanted to make and test the RAP AC mix designs for its projects, itself.

Vulcan issued certification letters, signed by Aaron Godfrey, to Menefee in which Vulcan certified that it would "furnish asphalt paving materials" for the Overlays Project and the Academy Project, from its Fresno plant, that would comply with the "State of

---

**8** Mark Horn, Menefee's AC expert, testified that the Overlays and Academy contracts permitted the use of RAP AC. He noted the contract specifications for RAP AC "were close to what Caltrans required to have RAP in the mixes."

California Standard Specifications, Section 39."[9]  The certification letter for the Overlays Project was sent on July 13, 2009; the certification letter for the Academy Project was sent on December 8, 2009.  Attached to each letter were additional documents concerning the components of the respective mix designs as well as the County's respective verification.  Mike Menefee testified he understood the letters to be certifying that the RAP AC from Vulcan's Fresno plant would comply with Section 39 of the 2006 Caltrans Specifications.  Mike Menefee was asked:  "And to your understanding, what was the County's role in the mix design process for the RAP AC?"  He responded:  "The County's role in the RAP AC was, they basically verified it.  They basically took Vulcan's ingredients, put them all together and said look, this is the real stuff, this is asphalt.  This is what you are going to get."  Mike Menefee further testified, that upon receipt of each certification letter, he believed Vulcan had taken all steps required under the project contracts to gain the County's approval of RAP AC mix designs for each project.

Menefee's intentional misrepresentation claims were based on Vulcan's certification letters regarding RAP AC from its Fresno plant.  Menefee's trial theory was primarily that the RAP AC mix designs certified by Vulcan as complying with Section 39 of the Caltrans Specifications *did not comply with Section 39 of the 2006 Caltrans Standard Specifications*, which were referenced in Menefee's contracts with the County for both the Overlays and Academy Projects.  As to the Overlays Project, Menefee also took the position that the RAP AC from Vulcan's Fresno plant did not comply with *any* version of the Caltrans Specifications (i.e., neither the 2006 version, nor the 2009 version).  In addition, Menefee sought to show that, for both projects, Vulcan did not

---

[9]      Menefee's expert witness, Mark Horn, testified that Section 39 of the Caltrans Specifications is the part of these specifications that deals with asphalt concrete.

10.

submit complete RAP AC mix designs to the County, along with backup test data, as required in the project contracts, but rather submitted incomplete mix designs, and relied on the County to run the requisite tests and finalize and approve the mix designs. In this context, Menefee's theory was that the County's laboratory was unreliable, and consequently, in certifying, based simply on the County's testing, that the RAP AC mix designs for both projects met Caltrans Specifications, Vulcan acted recklessly and without regard for the truth of the certifications.

**The Overlays Project**

As noted, Vulcan sent Menefee a letter on July 13, 2009, signed by Aaron Godfrey, certifying that the RAP AC Vulcan would provide from its Fresno plant for the Overlays Project would comply with Section 39 of Caltrans Standard Specifications.

Godfrey, technical services specialist for Vulcan, testified that Menefee had never provided the actual contract specifications for the Overlays Project to Vulcan; nor did Fresno County. Steve Deis, Fresno County's materials engineer, told Godfrey the County was working off the 2008/2009 Caltrans Specifications and asked Vulcan to provide aggregate samples that complied with those specifications; Vulcan prepared and provided the requested samples. Vulcan did not run all the requisite quality tests on the mix design for the RAP AC for the project, to be produced at Vulcan's Fresno plant. The County wanted to do the testing itself and did so. Godfrey did not specifically apprise Menefee that the County was proceeding under the 2008/2009 Specifications and doing some of the testing itself.

When the County verified the RAP AC mix design for the Overlays Project, certain forms that apply to the 2008/2009 Specifications and various testing details were not included in the County's documentation. Godfrey did not ask for the backup test data at the time he issued the certification letter, although he later understood that the underlying tests were completed by the County. Godfrey explained he had "full trust" in

11.

the County laboratory, which was reliable and had done verifications on past projects, for the last 10 years, for which Vulcan was the supplier. Godfrey therefore issued the certification letter for the Overlays Project, to Menefee. Godfrey testified that the certification letter sent to Menefee regarding the RAP AC from Vulcan's Fresno plant, with the County's verification form attached, was meant to specify that Vulcan would make the RAP AC that the County had tested, under Caltrans Specifications, for the project. Godfrey understood the County had applied Section 39 of the 2008/2009 Caltrans Specifications and believed the contents of the letter to be true.

Menefee called Mark Horn as its expert witness on AC mix design and AC production processes. Horn testified that Vulcan had great expertise in AC materials, but the County laboratory, which was not certified by Caltrans, was incompetent. Horn testified that the County did not properly test the mix design for the RAP AC to be produced at Vulcan's Fresno plant, for the Overlays Project. Horn testified the RAP AC mix design tested, verified, and approved by the County did not comply with the 2006 Caltrans Specifications or the 2009 Caltrans Specifications, or with certain aspects of the project contracts between Menefee and the County.

Shortly after the Overlays Project was completed, the County made complaints about the condition of parts of two of the mountainous roads included in the Overlays Project, namely Auberry Road and Dinkey Creek Road. Menefee first learned of the County's complaints in this regard in February 2010. The County's complaints were directed only at limited sections of Auberry Road and Dinkey Creek Road, not the entirety or even most of either of the roads. Mike Menefee testified: "The County was saying at that point that it was a workmanship issue, that our workmanship had failed and we had failed to place the road properly and that's why, that's what was causing the failures."[10]

---

[10] Rodney Menefee testified that during the paving work on the Overlays Project, County inspectors had constantly raised issues with Menefee to the effect that Menefee

Vulcan recommended Menefee hire Mark Horn to investigate the failures coming to light on parts of Auberry Road and Dinkey Creek Road. Menefee did so and Horn, along with a Vulcan technician, investigated the failure areas.[11] Horn testified that the RAP AC placed on Auberry Road and Dinkey Creek Road was not designed to perform well in cold climates. However, Vulcan's Marcos Galaviz testified that Vulcan had supplied the same or similar product for use on mountainous roads in various previous projects for both Caltrans and the County.

The County ultimately made a warranty claim against Menefee for defective workmanship for its work on parts of Auberry Road and parts of Dinkey Creek Road, leading to litigation between Menefee and the County; the County did not fault the AC used to pave the roads.[12] Jerry Menefee testified that Menefee drew on its working capital to handle the litigation with the County, and consequently its bonding capacity was affected (limiting its ability to bid for jobs).[13] Menefee's reputation also suffered as

---

was using too much asphalt and that the asphalt was too thickly placed or applied. Mike Menefee also acknowledged he had disagreements and arguments with County inspectors when the Overlays Project was underway.

[11]     Subsequently, Horn advised Menefee on the Academy Project and served as Menefee's AC expert in the instant trial.

[12]     Vulcan's AC paving expert testified that the fact that problems occurred only in limited areas, rather than the throughout the roads, indicated the problems arose from workmanship, not materials. Vulcan's expert further testified that the daily diaries prepared by County inspectors reflected a lot of concerns with workmanship and the expert was able to correlate the county inspectors' concerns over workmanship with the areas where problems later arose. Rodney Menefee testified that the problems areas appeared to correlate to the areas that were paved with RAP AC from Vulcan's Fresno plant (as opposed to areas that were paved with AC from Vulcan's Sanger plant, which produced AC that did not contain RAP).

[13]     Menefee prevailed in the litigation (arbitration) with the County and the record indicates the County paid Menefee $771,000 as a result (this information was not intended for the jury).

13.

a result of the litigation.  Mike Menefee testified that "being sued on a workmanship issue" harmed his reputation.  He also testified the litigation had decimated the company.

**The Academy Project**

The process by which the County verified and approved the RAP AC mix design for RAP AC to be produced (at Vulcan's Fresno plant) for the Academy Project, mirrored the verification and approval process for the RAP AC mix design for the Overlays Project.  Vulcan provided information regarding some of the constituent ingredients for the RAP AC to the County, including aggregate gradations, and the County tested and approved a RAP AC mix design for the Academy Project.  Thereupon, on December 8, 2009, Aaron Godfrey, on behalf of Vulcan, sent a letter to Menefee certifying that the mix design complied with Caltrans Standard Specifications; he attached the County's verification to the letter.[14]  Godfrey understood that he was certifying the mix design as being compliant with the 2008/2009 Caltrans Specifications, since he was told by Steve Deis, the materials engineer for the County, to use those specifications for the Fresno-plant RAP AC mix on the project.[15]  However, Godfrey did not confirm that all the required documentation that applies to creation and approval of a mix design under the 2008/2009 Caltrans Standards was in fact completed.  Godfrey also did not specifically

---

[14]    Menefee's counsel and Godfrey had the following exchange:

"Q    And do you recognize this as the certification letter that you provided to Menefee Construction on or about December 8th of 2009 with respect to the Fresno RAP AC mix design for the Academy Avenue project?

"A    That's correct.

"Q    And you similarly certified that this mix design complies with the State of California standard specifications Section 39, three-quarter maximum HMA [hot mix asphalt] with 15 percent recycled asphalt Type A gradation aggregate?

"A    That's correct."

[15]    Godfrey testified that the 2008 and 2009 Caltrans Specifications were referred to interchangeably.

inform Menefee that the County was working off the 2008/2009 Caltrans Specifications for the RAP AC mix design. Mark Horn, Menefee's AC expert, testified that the RAP AC mix certified by Vulcan to Menefee, for purposes of the Academy Project, *was compliant* with the 2009 Caltrans Specifications (but not the 2006 Caltrans Specifications).

In April 2010, as Menefee prepared to begin work on the Academy Project, it placed a RAP AC test strip for the Academy Project. A test strip allows the contractor to show that the paving material and paving methods would achieve contract parameters. The test strip failed and the County informed Menefee, by letter, of the reasons for the failure. Mike Menefee testified about a letter sent by the County to Menefee on May 28, 2010, in this regard. In the letter, the County stated that "the test strip was not accepted based on compaction results showing less than [the] 96% relative compaction as required by the project's Special Provisions."[16] The letter further informed Menefee that the RAP AC mix design submitted to the County by Vulcan on Menefee's behalf "did not meet the criteria included" in the 2006 Caltrans Specifications.

More specifically, the County's letter stated: "The mix design that your firm submitted did not meet the criteria included in the 2006 Standard Specifications, but was approved on the basis of the County's allowance of AC mix designs using RAP as contained in the project's Special Provisions. The County relied upon its engineering judgment including our review of later versions of the Standard Specifications (updated Section 39) when we verified the acceptability of your proposed mix design." Upon

---

**16**     Mike Menefee defined the term, compaction, as follows: "You guys have all planted a plant, right? And you plant the plant in the ground and you put the dirt around it. And then you water it [and] taking a hoe or a something and poking the dirt around the plant, it settles down, right? When you poke around the dirt from around the plant, that's compaction." Mark Horn also defined the term, compaction: "Well, compaction is – is the asphalt concrete, what we design. It has a certain amount of air voids in there for longevity."

15.

receipt of the County's letters regarding the test strip, Menefee became aware that the mix design was not in compliance with the 2006 Caltrans Specifications, but rather was approved under the 2009 Caltrans Specifications (which addressed RAP AC).

In response to the County's notification, and in light of the County's verification and approval of the RAP AC mix design for the Academy Project pursuant to the 2009 Caltrans Specifications, Menefee asked the County for a formal change order "to change to the new updated Section 39." The County declined to issue a change order.[17] Menefee then decided to hold off on using the RAP AC from Vulcan's Fresno plant for the Academy Project and to instead use AC from Vulcan's Sanger plant (as the Sanger plant produced AC that did not contain RAP), a decision that was supported by Mark Horn.

At Menefee's request, Vulcan hired Horn to redesign the RAP AC mix design for the Academy Project. Godfrey, Vulcan's technical services specialist, testified Horn came up with two AC mix designs—one complied with the 2006 Caltrans Specifications and the other complied with the 2008/2009 Caltrans Specifications. The redone mix designs were submitted to the County on June 28, 2010. The County began the verification process on July 20, 2010. Godfrey testified the County ultimately verified and approved Horn's new RAP AC mix design that complied with the 2008/2009 Caltrans Specifications.[18] The County's verification and approval came on November 2, 2010, when the Academy Project paving work was in its final stages.

---

[17]    A letter from the County to Menefee, dated June 23, 2010, and included in the record, provides: "The County has received your letter dated June 15th, 2010 wherein you requested that a change order be processed for the asphalt concrete (AC) mix design specifications. Please be advised that the County does not intend to issue a change order because there has been no revision to the project's Special Provisions regarding the AC mix design requirements." This letter was mentioned but not discussed at trial, beyond Mike Menefee's testimony that the County declined to issue a change order.

[18]    Mike Menefee testified that the redesigned RAP AC mix design approved by the County complied with the 2006 Caltrans Specifications. Marcos Galaviz, who, as a

16.

Mike Menefee testified that Menefee's paving schedule for the Academy Project was extended from the planned 22 days to 55 days, as Menefee had been utilizing AC from Vulcan's Sanger plant rather than the Fresno plant, and the Sanger plant's daily output was less than the Fresno plant's daily output. Jerry Menefee also testified that Menefee's paving schedule on Academy Avenue got extended for this reason. There were no disputes or problems between the County and Menefee as to the satisfactory completion of the Academy Project (the dispute was limited to the Overlays Project).

In addition to the issue of Vulcan's certification letters regarding the AC produced at its Fresno plant for both projects, evidence was presented at trial regarding a dispute as to the agreed-upon price for the AC from Vulcan's Sanger plant that was used on the Academy Project. The written quote faxed to Menefee, on bid day, June 4, 2009, by Vulcan, stated that the price of AC from Vulcan's Fresno plant would be $41 per ton and from the Sanger plant would be $44 per ton. However, Mike Menefee testified that shortly after Galaviz provided the written quote, Mike Menefee had phone conversations with Galaviz, in which Galaviz agreed to lower the price of the AC from the Sanger plant to $41 per ton, equivalent to the price of RAP AC from Vulcan's Fresno plant. Galaviz denied having any such conversations with Mike Menefee, and Vulcan introduced Galaviz's phone records from bid day in support of his testimony. Galaviz also testified he was simply not authorized to offer such a big price discount.

The evidence showed that, as to the Academy Project, Menefee was billed for AC from the Sanger plant at the price of $44 per ton. However, after paying an initial bill, Menefee only paid Vulcan $41 per ton for asphalt from the Sanger plant, until it stopped paying altogether. There was also evidence that Vulcan offered, at one point, to reduce the price of AC from the Sanger plant to $43 per ton.

---

salesman, did not have detailed information about the verification process, also indicated that the redesigned RAP AC mix design approved by the County complied with the 2006 Caltrans Specifications.

Menefee argued to the jury that Marcos Galaviz had agreed at bid time that the price of AC from its Sanger plant would be $41 per ton. Menefee further argued that it ultimately paved the Academy Project with AC from Vulcan's Sanger plant only, as Menefee was waiting for the County to approve Mark Horn's new RAP AC mix design for Vulcan's Fresno plant and the approval came towards the end of the work on the project. Menefee argued that, given the circumstances, Vulcan raised the price of AC from its Sanger plant to $44 per ton, to gouge Menefee.

## DISCUSSION

I. **Menefee Failed to Establish Damages and the Court Properly Granted Nonsuit on its Fraud Claims Regarding Both Projects**

The trial on Menefee's intentional misrepresentation claims was bifurcated into a liability phase and a damages phase; a third phase of the trial was devoted to Vulcan's claims in its cross-complaint. Menefee's claims on appeal concern the damages phase of the trial, as well as the final phase in which Vulcan's cross-complaint was at issue.

We will first address Menefee's arguments regarding the damages phase of the trial on Menefee's fraud claims. At the end of the liability phase of the trial on Menefee's fraud claims, the jury found that Vulcan had made intentional misrepresentations to Menefee in the context of both the Overlays Project and the Academy Project. In the damages phase of the trial, the trial court found, as a matter of law, that Menefee failed to prove any damages with respect to either project. Vulcan made a motion for nonsuit and the trial court granted the motion. Menefee argues the trial court improperly found Menefee did not prove any damages and improperly granted Vulcan's motion for nonsuit. We disagree and affirm the trial court's rulings.

A. *Background: Damages Phase of Trial*

In the liability phase, the jury was instructed on the elements of intentional misrepresentation pursuant to Judicial Council of California Civil Jury Instructions (CACI) No. 1900. Specifically, the jury was instructed as follow: "Menefee

18.

Construction claims that Vulcan Materials made a false representation that harmed it. To establish this claim, Menefee Construction must prove all of the following: (1) That Vulcan Materials represented to Menefee Construction that a fact was true; (2) That Vulcan Materials' representation was false; (3) That Vulcan Materials knew that the representation was false when Vulcan Materials made it, or that Vulcan Materials made the representation recklessly and without regard for its truth; (4) That Vulcan Materials intended that Menefee Construction rely on the representation; (5) That Menefee Construction reasonably relied on Vulcan Materials' representation; (6) That Menefee Construction was harmed; and (7) That Menefee Construction's reliance on Vulcan Materials' representation was a substantial factor in causing its harm." The jury was further instructed that the applicable standard of proof was preponderance of the evidence.

The special verdict form returned by the jury had two parts: one pertained to the Overlays Project and one pertained to the Academy Project. As to each project, the verdict form presented a set of six questions to the jury, mirroring the elements set forth in CACI No. 1900 described above. The questions set forth on the verdict form, as to each project were as follows:

> "1. Did Vulcan Materials Company represent to Menefee Construction that a fact was true?
>
> "2. Was Vulcan Materials Company's representation to Menefee Construction false?
>
> "3. Did Vulcan Materials Company know its representation was false when it was made or did it make the representation recklessly and without regard for its truth?
>
> "4. Did Vulcan Materials Company intend that Menefee Construction rely on the representation?
>
> "5. Did Menefee Construction reasonably rely on the representation?

"6. Was Menefee Construction's reliance on Vulcan Materials Company's representation a substantial factor in causing harm to Menefee Construction?"

The jury answered all questions affirmatively as to both projects.

**(i)**        **Discussions Between the Court and Parties as to Menefee's Witnesses and Evidence in the Damages Phase and the Applicable Measure of Damages**

The trial then progressed to the damages phase with respect to Menefee's intentional misrepresentation claims. When it came time for Menefee to present evidence regarding its damages, there were protracted discussions between the court and the parties, over multiple days, as to the applicable measure of damages. The court was concerned that the parties had not provided clear authorities for the court to rely on in determining the proper measure of damages. At one point, the court observed: "So, all I can say right now is it's patently clear to me that I don't know how we're supposed to proceed. I have a jury here and I don't know that this issue has been sufficiently flushed out to allow it to proceed to a damages phase right now."

There were also protracted discussions about problems with the proffered testimony of Menefee's damages-phase witnesses. As the discussions wore on, the court noted: "I'm really somewhat at a loss as to how all of these issues are left to now. I have been doing this quite [a while], and practiced for quite a while, and it just, I don't know why it's now when we have a jury waiting that I'm trying to decide what instructions to give and what the theories are, but I'm not necessarily casting aspersions on anyone in particular, it is just unusual. I have had plenty of complex cases and this has never occurred before."

The court asked Menefee to precisely describe the proffered testimony of its witnesses in the damages trial. Regarding its damages with respect to the Overlays Project, Menefee offered an expert witness, John Heberger, to testify about its business losses. Menefee's counsel described Heberger's proffered testimony as follows: "So …

the issue just becomes fundamentally that Heberger is going to testify that since 2010 the Menefees sustained losses, and those losses, you know, he's going to testify about what the amount [is] he's calculated. He did a business valuation in 2010, and he's done a business valuation in 2016. And fundamentally, he's going to testify about the loss from those years, so, which we're claiming is caused by Vulcan's conduct. Essentially, that comes down to the issue of the fact that, you know, Menefee lost its bonding capacity, you know, it got blackballed in the industry, it couldn't get prices, couldn't get good quotes, and, you know, so that's where – that's where we're at with the damages."

Vulcan's counsel raised several concerns regarding Heberger's proffered testimony. First, counsel noted that Menefee already had average losses of $180,000 over 2008 and 2009 (counsel mistakenly referenced the years 2007 and 2008 but meant the years 2008 and 2009). Vulcan's counsel also stated: "And so here we have Heberger, who wants to essentially say, don't look at 2008 and 2009, when Menefee got back into the paving business and were essentially taking a loss every year. Ignore that, and they want, he wants to enter expert testimony that had – had this Section 39 representation not been made, this company would have been worth $4 million, would have been having profits, having bids, and having jobs. It's not supported by the history. It's not supported by the evidence.… And this court has to act as the gatekeeper to rule out and keep speculative … testimony that doesn't have a foundation from going to the jury to confuse them."

Vulcan's counsel further pointed out that Heberger had acknowledged that in his calculation of damages, he could not "separate out the damages caused by the County and the damages caused by Vulcan." Heberger's notion of accounting for the County's role was to simply deduct $771,000, the amount awarded to Menefee in the arbitration with the County, from Heberger's evaluation of the lowered value of Menefee's business over the period from 2010 to 2016. Next counsel pointed out that Heberger's analysis combined two businesses owned by the Menefees, Menefee Construction and Short-Term

21.

Rentals and Sales, even though Short-Term Rentals and Sales was a separate legal entity and filed separate tax returns. Counsel stated: "[Heberger] includes in his analysis $1.6 million of loss from Short-Term Rentals and Sales. He says it's the same partnership, there are two pockets arising out of the same pant. And so he includes that because it's the same three people, the Menefees, that are the partners. Short-term Rentals and Sales was in existence for years and they were renting equipment." Counsel concluded: "[I]t's just a mess with trying to sort through and figure out what this guy's going to testify to."

Menefee's counsel responded to Vulcan's points: "So, *Mr. Heberger is not a causation expert*. So he didn't, you know, that wasn't what he did. He took a value of the [Menefee] business in 2010 and he valued the business in 2016. So that's – and he compared those values."

The court expressed significant concerns about Heberger's proffered testimony. The court stated: "[A]s to the Heberger report, I am confused about this Short-Term Rentals and Sales as versus Menefee Construction. They appear to be different businesses, and I don't know why it's in the report by Heberger as part of your damages when that seems to not have a lot of connection." Menefee's counsel stated: "The way [Heberger] looks at it, again, your Honor, is that it is essentially the same company, it's just a tax artifice, the same partners. The effect on one can't be measured without the effect on the other. It is a partner, they are both partnerships." The court observed: "But it is still a different business. It is not Menefee Construction, so I don't understand even if they are the same pair of pants in different pockets, it's still a different business than Menefee Construction and laying asphalt on a road. So I don't know why, if they have a Short-Term Rental and Sales business, which I haven't heard anything about it in this trial because it hasn't been at issue at all. I don't even know what the nature of that business is, but apparently Short-Term Rentals and Sales of equipment, I assume. That doesn't have anything to do with the project at issue here, so why would that come in at all, any evidence regarding that? It's – it's very tenuous."

22.

Menefee's counsel eventually suggested that Heberger could do new calculations. Vulcan's counsel protested: "When I took [Heberger's] deposition on or about March 15th, [2016,] I specifically said, if you do any additional work, I would like to be apprised of it, and he said okay, and I haven't heard a word since then." The court subsequently stated: "I am very concerned with Heberger's report, because I truly don't see how you have two businesses in here."

As for Menefee's damages with respect to the Academy Project, Menefee's witness with respect to these damages was Mike Menefee. Menefee's counsel described Mike Menefee's proffered testimony as follows: "[Mike Menefee is] just saying, this is how much we bid on the [Academy] project and this is how much [it cost us to complete the project]." Menefee's counsel added: "Well, so he has his bid items, your Honor, this is what it is.… We bid this much to do this project, here's the itemization of all the costs that it would be, and here's what we paid in our direct cost report and how much we ended up paying for [completing the paving part of the project]." Menefee's counsel explained: "[T]he issue with Mike is, of course, the delay costs, the additional costs in terms of resulting from the misrepresentation on the materials[,] and the price dispute [with regard to the Academy Project]."

Vulcan's counsel raised several concerns about Mike Menefee's proffered testimony. First, counsel noted that Vulcan had no notice that Mike Menefee would "give an expert opinion on the delay damages [that] occurred on Academy Avenue." Counsel noted that Vulcan had no opportunity to depose Mike Menefee on any issues related to damages. Counsel argued: "Michael Menefee should have been disclosed and produced as an expert on damages. He should have been identified as that. It wasn't done." Counsel argued that Mike Menefee was precluded from giving an opinion as to causation. Counsel stated: "Now, there's two issues here, there's notice and then there's a substantive part of [Mike Menefee's] testimony. As I understand it, based upon the discussion [earlier].… Mr. Menefee wants to say we bid $4,724,107.15, it cost us

23.

$5,179,681.45, so the difference is our damages. Now, and that difference is $455,573.43." Counsel continued: "The first thing [Mike Menefee wants to testify about] is that had Vulcan provided a compliant mix design for the RAP, Menefee would not have been so damaged, as Menefee could have pulled out of Vulcan's Fresno plant. Your Honor, first of all, that is an opinion on causation. And Mr. Menefee was not retained as an expert, either retained or non-retained on that issue. [¶] Secondly, because of the issue that [co-counsel] brought up, we don't know why the jury found fraud with respect to Academy Avenue.[19] It could be that they decided that there was no fraud with respect to the certification letter, but there might have been fraud with respect to the contract price. So there's nothing from their decision that can be used by this court to establish causation, nor should Mr. Menefee be allowed to testify about it."

The court expressed concerns about Mike Menefee's testimony. The court noted that Mike Menefee's "opinion as to damages would be an expert issue, not a lay issue."

---

[19] At the first opportunity after the jury rendered its verdicts, Vulcan's co-counsel addressed the court: "[W]e do need a little clarification on the Academy Avenue [verdict]. It's not clear, what are we talking about here. Was it the representation of the Section 39 that caused the delay? Are we talking about the comment from Marcos Galaviz that it was $44 versus $41 that was the fraud? It's a little unclear here. And I know the next phase deals with damages, but that's more of a numbers issue as opposed to what the representation was. And I think that has an impact going forward."

Menefee's counsel responded: "And our position is that the verdict is the verdict at this point. And if they had wanted to break it out that way, then they would have needed to have broken it out in the verdict form, but they agreed to it. So it is what it is at this point."

In light of the response from Menefee's counsel, the court did not proceed with having the jury clarify its verdict as to the misrepresentation at issue in the verdict regarding the Academy Avenue project. The court, however, agreed with Vulcan's counsel, as reflected in the court's comment at a later point: "The problem with the fraud finding on the way the verdict form is, I'm not really sure what [the jury] found was fraudulent.… It's not clear what conduct they are relying on to say it's fraud. And there's a couple of claims you have with Academy Avenue, so I don't know which one, necessarily, they are saying is fraudulent."

24.

The court ruled that Mike Menefee would be permitted to testify only as a percipient witness, to the extent he prepared the bids and the job cost journals. The court ruled that Mike Menefee was not permitted to testify that "[h]ad Vulcan provided a compliant mix design, Menefee would not have been so damaged as Menefee could have pulled out of Vulcan's Fresno plant."

Finally, Menefee sought to introduce testimony from Rodney Menefee in the damages phase, regarding legal bills for which Menefee had already received compensation in the arbitration proceeding with the County,[20] as well as regarding bills from Mark Horn for services provided with respect to the Academy Project. Vulcan's counsel raised several concerns about the potential introduction of this evidence. Vulcan's counsel stated that Vulcan had no notice of these damages claims and explained that the documents underlying Rodney Menefee's testimony about attorney fees and Horn's bills had only just been provided to Vulcan, in the middle of trial, although Vulcan had asked Horn for his invoices when Horn was deposed. Menefee's counsel acknowledged that this was the first time the documents were provided to Vulcan. Vulcan's counsel also pointed out that he had just learned, days ago, that Rodney Menefee was going to testify as to damages, adding that Rodney Menefee "was not identified in any capacity as a person who would testify about damages." Vulcan's counsel questioned the foundation for Rodney Menefee's proffered testimony. The court ruled the documents were stricken because they had never been produced to Vulcan, and in turn, that the proffered testimony of Rodney Menefee would not be admitted. Specifically, the court ruled: "I'm not going to allow the documents to come in because it appears to the court that they were, at least asked for and were never provided, and

---

[20]     Vulcan's counsel noted that Menefee received "an award for fees and costs for this time period in the amount of $777,000" from the County. Menefee's counsel acknowledged that Menefee had already been compensated by the County for the attorney fees in question.

therefore it wouldn't be equitable to allow the documents in at this late date.  [¶]  And as for the testimony by Rodney Menefee as to the amounts paid, there's no basis for the statements, unless you have something else, so I'm not going to allow that either."

During the discussions with the court, Menefee argued that the correct measure of damages was the general tort measure of damages, as codified in Civil Code section 3333.[21]  Section 3333, the general tort damages statute, provides:  "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Menefee argued that the damages testimony of Heberger and Mike Menefee was proper under section 3333.  Menefee's attorney argued:  "Fundamentally, [section] 3333 is just like any other tort case.  It just says essentially that you are entitled to all damages proximately caused.  And there's – there's no – there's no limit in terms of out-of-pocket or benefit-of-the-bargain, I mean, it's just – it's almost like your traditional – it's like your traditional vehicle lawsuit."  Menefee's counsel contended that measures of damages that were more suited to fraud arising from the formation or direct performance of a contract—such as the measures of damages encompassed in section 3343 (see below) or the California Commercial Code/Uniform Commercial Code[22]—were not applicable in this instance as the causes of action were more correctly seen as independent torts, separate from the contract, rather than contract-related fraud as would be at issue in a breach of warranty claim.

---

[21]     Undesignated statutory references are to the Civil Code.

[22]     Commercial Code section 2721, "Remedies for fraud," provides:  "Remedies for material misrepresentation or fraud include all remedies available under this division for nonfraudulent breach.  Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy."  (See *Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc*. (2007) 156 Cal.App.4th 766.)

Menefee's counsel argued: "[T]his issue about being outside the contract, and not on the contract[,] is significant. Because when you have contract damages, you can negotiate those risks. You can, you know, talk to the other side. Well, this is a potential risk here. But you can't do that in circumstances where there's an intentional misrepresentation." Counsel added that because of the extra measure of blameworthiness inherent in fraud, and because in fraud cases there is no concern as to the predictability of the cost of contractual relationships, fraud plaintiffs can get a broader measure of damages. Counsel concluded: "The point is, we're entitled to put on the damages that we believe were caused as a result of this, and then the jury gets to decide whether those damages were proximately caused by Vulcan's conduct."

Vulcan, on the other hand argued that the correct measure of damages was set forth in section 3343, which applies to damages arising from property transactions (section 3343 provides for *out-of-pocket* damages plus any "additional" or consequential damages). Specifically, section 3343, "Fraud in purchase, sale or exchange of property; additional damages," provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including [certain categories of damages specified in the statute]." Vulcan's counsel argued, in the alternative, that the benefit-of-the-bargain measure of damages applied. Vulcan's counsel contended that Heberger's proffered testimony and Mike Menefee's proffered testimony did not reflect out-of-pocket damages or benefit-of-the-bargain damages.

Menefee's counsel responded: "I just want to say that we're not talking about the goods, we're talking about the misrepresentation, that that's the deceit aspect of this case. And so, you know, we're not saying that the goods, you know, we're not – this isn't a breach of warranty claim. It is no longer a breach of contract claim. We're back at this issue about the deceit and the conduct, and that's the question. [¶] So we're not talking

27.

about on the contract, we're talking about a duty that sprang from the contract, which is what [*Sprague v. Frank J. Sanders Lincoln Mercury, Inc*. (1981) 120 Cal.App.3d 412] talks about. And that's the issues that we're dealing with in this case. And as a result of that, since it is not on the contract, [section] 3333 applies. And there is no [CACI No.] 1923 (out-of-pocket damages) and there's no [CACI No.] 1924 (benefit-of-the-bargain damages), because neither one of those really, it's not a limit. That may be part of it, but [section] 3333 is broader than that and that's what the case law recognizes."

The court considered CACI fraud instructions, specifically CACI No. 1923 (out-of-pocket damages) and CACI No. 1924 (benefit-of-the-bargain damages).[23] At one point, the court observed: "[T]here has to be a CACI instruction. This isn't the first intentional misrepresentation case to ever come before any court." Menefee's counsel argued: "[I]t's not on the contract, [section] 3333 is the proper measure of damages. So don't get lost in [CACI No.] 1923 and [CACI No.] 1924." Menefee's counsel emphasized: "[B]oth [CACI No.] 1923 and [CACI No.] 1924 [are] not consistent with 3333, which is essentially all damages proximately caused [whether] they could have foreseen it or not." Menefee's counsel argued: "[Thus,] it's just a straightforward [question], what are the damages? That's what … the jury's asked to determine. [¶] [T]he only reason that they need to be instructed otherwise, is [if] there was some other special rule that applied in the circumstance and it doesn't."

---

[23]    "The 'out-of-pocket' measure of damages 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received.' The 'benefit-of-the-bargain measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.'" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240.)

28.

The court subsequently noted: "[E]ven if I go with [section] 3333 and throw out [CACI No.] 1924, it just appears that the report by Heberger is pretty speculative as to why would you value the business, how, what it was before and then what it is after. It seems much too broad. And having both businesses in here doesn't seem to be correct either. It's not just Menefee Construction, now you have got a whole different business in your report. I don't know how I can let that go, because it doesn't seem appropriate.… It just seems too farfetched." Ultimately, the court decided CACI No. 1924 (benefit of the bargain damages) provided a guide to the measure of damages in the instant case; the court did not definitively rule out the availability of other types of damages, such as consequential damages. Specifically, the court stated: "I do think that [CACI No.] 1924 can be worked, it is a fraud case, those are the instructions that are there for fraud, that's fraud. So that's that part of it."

Vulcan's counsel argued that the proffered testimony of both Heberger and Mike Menefee should be stricken as the testimony of both was too far afield with respect to Vulcan's tortious conduct; Heberger's testimony was simply a "business valuation" and Mike Menefee's testimony was simply the difference between the bid cost amount for paving the Academy Project and the ultimate cost of paving the project (as reflected in a job cost journal). The court concluded: "At this point, since we're in the middle, I have a jury waiting, I think it is the most prudent course is to have the evidence in and have it be evaluated." The court agreed that as to Heberger, an Evidence Code section 402 hearing would be appropriate before Heberger testified in front of the jury.

### (ii) Heberger's Testimony at Evidence Code Section 402 Hearing

John Heberger, Menefee's expert witness regarding damages from the Overlays Project, testified in an Evidence Code section 402 hearing, for the court to "determine the basis of" and "extent of" his testimony. Heberger testified he was a business valuation expert and described the term, business valuation, as the determination of "the fair value

29.

or fair market value of a business." Heberger described the underlying *assumptions* he made in conducting a business valuation for the Menefees: "Well, basically that the faulty product provided by Vulcan Materials to Menefee that were utilized in the Fresno County contract, initiated a chain of events beginning with a warranty claim in early 2010, that the overlays project, I believe it was, was failing. And as result of that, there was a claim posted against the Menefee's performance bond, and that led to a situation where there was a dispute between Menefee and Fresno County which caused Menefee to file litigation in approximately June of 2011, I believe, against the County. And at that point, the operations for Menefee ceased more or less because of their inability to obtain bonding, their inability to obtain competing – well, to obtain bids from Vulcan and others for materials. And they basically were consuming their working capital and supporting the company when it had no revenues and in pursuing the litigation against the County. And as a result of all of those things, essentially, Menefee is out of business."

Heberger acknowledged that he did not form an expert opinion that Menefee Construction went out of business; he simply started with that assumption. Similarly, he assumed the company was unable to get bonding. Heberger also agreed that he was not a "causation guy." Heberger said: "I have done nothing other than to rely on the Menefees' and counsel's theory of the case." Heberger merely valued the business as of December 31, 2010, regardless of how the company got there; he valued Menefee at $6.6 million as of that date. He then evaluated what the loss would be, had the company liquidated as of December 31, 2015.

Although Menefee made 29 bids between January 1, 2011, and April 12, 2012, which would indicate the company had been able to secure bid bonds, Heberger did not take that fact into consideration. He did not take into account Menefee's working capital during that period. Heberger did not recall the requisite ratio of working capital to the ability to bond. Heberger did not investigate why Menefee stopped making bids after that time. Heberger emphasized: "I'm the financial guy, not the causation person."

Heberger also acknowledged that he did not take into consideration the fact that Menefee had a loss of $37,736 in 2008 and a loss of $338,747 in 2009. Heberger did not verify the accuracy of the financial statements and the information he received from the Menefees. As for the loss amount Heberger calculated, he was not able to differentiate between damages attributable to Fresno County and damages attributable to Vulcan. Heberger's theory was that Vulcan was responsible for the net loss after Menefee was paid by the County.

For purposes of his evaluation, Heberger combined Menefee Construction and Short-Term Rentals and Sales. Although Menefee Construction and Short-Term Rentals and Sales "are two legal entities, they have the same general partners, they have the same owners, the same management." Heberger testified: "It's my opinion that the aggregate loss sustained by the Menefees is, excluding legal fees, is $4,128,000." This calculation was reflected in Heberger's expert report. Heberger had not had the time to separate out Short-Term Rentals and Sales from his calculations.

The court had a short exchange with Heberger during the Evidence Code section 402 hearing. The court asked Heberger: "Short-Term Rental[s] and Sales is a completely different business, correct?" Heberger answered: "It's a different entity." Heberger added: "Same partners, same management." The court asked: "But different completely?" Heberger replied: "Yes. But, you couldn't tell that by visiting the company's offices. There isn't a little skyscraper here that says Menefee Construction, and another one that says Short-Term Rentals and Sales. You just, you walk in and it, the sign out on the street just says Menefee."

After Heberger's testimony at the Evidence Code section 402 hearing, Vulcan sought to exclude Herberger's testimony in the damages phase. The parties and the court had another long discussion about the appropriate measure of damages in the case and whether Herberger's testimony was relevant. Menefee's counsel argued Heberger's testimony was relevant. Counsel argued: "We're talking about a representation, a

31.

fraudulent misrepresentation at this point, that the jury has decided that caused a warranty claim against Menefee. Okay? That warranty claim had devastating effects to this company. Vulcan cuts them off from supplying them, you know, they can't get quotes, they are using their working capital to their bonding capacity. What you haven't heard, your Honor, in terms of the bonding issues is that Menefee was getting bonds through 2012 based on their 2010 financials, that's why they were able to get bonding for so long. And you can only stretch it out for so long before the bonding company wants updated financials. [¶] So effectively, this company has been put out of business. And that's – and our theory of the case has been that that's been a direct and proximate result of these representations by Vulcan that caused these cascading problems that had devastated their business. And that's the case that we're putting on."

Vulcan's counsel responded to the argument by Menefee's counsel: "[Y]our Honor, based on the information Mr. Heberger admitted he hadn't considered the prior losses, he hadn't considered a number of factors that show that his, his testimony is speculative, it doesn't have foundation. [¶] And the last thing is, they are making, again, this quantum leap, saying that our materials caused the warranty claim. Well, the only evidence that exists is that the warranty claim was a result from the County. It was the County's decision. It was the County's reaction that caused harm and it was based on workmanship and/or compaction issues. [¶] It's been over six years and the County's never made a claim or taken any action against Vulcan or even Menefee related to the materials. And they can say the County was wrong, but there's never been – that's never been adjudicated, that has never been conclusively established, so that's a huge gap and a huge quantum leap that they are just assuming that these materials caused all these other damages. And because it's never been determined, and because, more importantly, the County never took action based on the materials, that's just a complete false statement and there's no causal connection."

Menefee's counsel countered: "[W]e have defeated [the] warranty claim against the County of Fresno based on this workmanship issue, [Vulcan] tried to rehash this workmanship issue on the fraud claim and they lost, and so now we have two adjudications clearing Menefee from any wrongdoing in this case, but we still got a road that failed, which Mr. Horn says failed because of the terrible mix design. That's what the state of the evidence is. And based on that, we were harmed. And so far, the jury has agreed with that position.… [¶] … [¶] So we should be able to put on our evidence of damages under [section] 3333." Menefee's counsel pointed out to the court: "And you indicated earlier that it's not on the contract, so we're in [section] 3333, not [section] 3343, and not the UCC. And that's a broader measure of tort damages, which would include, as in [*Sprague v. Frank J. Sanders Lincoln Mercury, Inc.*, *supra*, 120 Cal.App.3d 412], you know, emotional distress if somebody was emotionally distressed. That's not the case with a corporation, but it's a broader measure of damages. [¶] Does it make any sense in the context of [section 3343] to have emotional distress damages in [CACI No.] 1924? Does it make any sense to have emotional distress damages in the context of CACI [No.] 1923? No. Why? Because those are contract cases, that's a contract measure of damages."

The court indicated it was still considering the issue of the proper measure of damages and ruled it would permit Heberger to testify. Since it was time for the lunch recess, the court told the parties to "[c]ome back at 1:30" to begin witness testimony in the damages phase of the trial.

### (iii)    Heberger's Trial Testimony Regarding Overlays Project Damages

At the start of the damages phase of the trial, the court ruled that Hebeger would be precluded from testifying about his assumptions concerning the dispute between Menefee and Vulcan, as he did not rely on those assumptions and merely did a business valuation. The court permitted the parties to give short opening statements. Menefee's

counsel described Heberger's anticipated testimony: "John Heberger has done an evaluation of the business interruption losses as a result of the mix design, effective of warranty claim, and having a cascading effect into Menefee's businesses since 2010. And what he's going to explain to you, and the evidence will show, is that Menefee had a business in 2010 that he valued at approximately $6 million. And what has happened is, he has valued essentially the business now, and what's going to happen, effectively Menefee's out of business, and they are going to need to liquidate in order to recover any of that money back that they had in that business. But what he's going to explain to you, is that by liquidating the business, Menefee's not going to be able to recover all of its damages that, as result of that liquidation. It is not going to receive that business value. And what he will tell you is that based on his calculations, the damages to Menefee are approximately $4,128,000."

Vulcan's counsel stated in his opening statement, in part: "You are going to hear testimony about Menefee Construction and its financial condition. And it didn't start paving until 2008. [¶] In 2008 and 2009 it lost approximately $370,000. In 2010 it had a profitable year of a little over $400,000, but then lost money every year after that up through 2015. [¶] Menefee Construction did make some money in 2006 and 2007, but it wasn't in the paving business then. And it's kind of unclear between this arrangement between Menefee Construction and Short-Term Rentals and Sales, because Short-Term Rentals and Sales didn't own any equipment, but yet at times it's filing tax returns that shows that it's leasing equipment or that it's selling equipment. So if you are confused, so am I, as to how this company is proceeding." Counsel added: "[S]ince returning to the paving business in 2008, Menefee Construction has lost about $1.1 million. And since 2006, Short-Term Rentals and Sales has only had two profitable years and has lost about $1.6 million. [¶] So when you look at the history of these companies, and Mr. Heberger has decided to combine them, even though we have only been talking about

34.

Menefee Construction in this case, it's had a loss of $2.7 million since 2006. So the evidence may lead you to the inference of why this suit was really filed."

Thereafter, John Heberger's testimony began. Heberger was a certified public accountant. Heberger testified he conducted a business valuation in this matter using an "asset approach," rather than a market approach or an earnings approach. Heberger did not use a market approach because "there was not likely to be found any comparable sales data on Central California asphalt paving businesses." Heberger did not use an earnings approach because "in many of the years that Menefee operated, they either had wildly fluctuating profitability, or they had operating losses." "The asset approach really is an evaluation of the – the actual assets, tangible and intangible, that are owned by an operating business, and a review of them to assess their fair value." Heberger further explained: "And then I assumed, I made a *key assumption*, after looking at the situation and in talking to the Menefees, that it was not likely that they were going to be able to avoid a liquidation of the company, and so I adopted a liquidation approach and identified how the value, the total value that I had computed, how was that going to be recovered." (Italics added.) Heberger did not independently assess why Menefee Construction would be on the brink of liquidation as he was not "the causation guy."

Heberger then testified, without warning, to an entirely *new* number as to Menefee's damages as compared to his report, his testimony in the Evidence Code section 402 hearing (before the lunch recess), and the number posited by Menefee's counsel in his opening statement. Heberger testified: "I computed that the Menefees' damages, excluding legal fees, are approximately $3,973,000." In a stark departure from his report and prior testimony, Heberger stated he did not include Short-Term Rentals and Sales in that number; rather $3,973,000 was the loss to Menefee Construction itself. Heberger explained: "Between the time I was here earlier [i.e., before the lunch recess] and now[,] I revised the computation to eliminate Short-Term Rentals from the computation." Heberger did it quickly, in "[a] couple of hours," at the request of

35.

Menefee's counsel. This was the first time in the course of his work on the matter that Heberger had attempted to separate out Short-Term Rentals and Sales from his calculations.[24] Heberger acknowledged that Short-Term Rentals and Sales was a separate legal entity, but he had combined Short-Term Rentals and Sales and Menefee Construction throughout his work on the matter, until this point. Herberger explained his newly-revised number: "My original number combined both enterprises, is $4,128,000 as the loss. [¶] If you pull out Short-Terms Rentals and Sales [and] solely relate [the loss] to Menefee Construction Company, the number, the loss is $3,973,000." Heberger had to "recast the data" on an "enormous amount of spreadsheets" to come up with the new number.

Using an asset approach, Heberger determined the value of Menefee's business was $6,585,000, as of December 31, 2010. Heberger testified: "The majority of that $6 some million of business value is in the form of equipment, approximately $3.7 million, the rest of it is in cash and accounts and notes receivable." Heberger explained that the $3.7 million equipment value was assigned by "[s]ome Menefee family," not a licensed appraiser.[25] Heberger also added $1,228,000 to the valuation; the additional amount consisted of "operating losses for years after 2010, which the Menefees invested in the business, keeping it in operation, maintaining its equipment, and doing … other things."

Heberger testified that the profit and loss histories of the companies were irrelevant to his calculations. Heberger acknowledged that since 2008, the combined losses for Menefee Construction and Short-Term Rentals was $2.7 million. Heberger testified: "I have abandoned the earnings approach and gone elsewhere." Heberger

---

[24] Heberger testified he had spent about 130 hours to 140 hours on the matter, to date.

[25] Heberger added that the $3.7 million figure was also reflected in Menefee's financial statements that were reviewed by its certified public accountants; Heberger relied on that as well.

further testified that it was not important to him that Menefee made 27 project bids, over 2007 and 2008, and only won one of those bids. Vulcan's counsel asked Heberger: "I want to make sure I understand. As of 2010 you put a value on the business of $6.6 million, and the fact that it had lost money every year up to that date, with the exception of 2010, and had the bid history, would you recommend to a client that they pay $6.6 million for that business?" Heberger answered: "Yes." He explained: "I never met a business purchaser who didn't believe he was going to do a better job than the people he just bought that business from."

While Heberger testified Menefee's bid history was not important for his assessments, he acknowledged he was told by the Menefees and Menefee's counsel that Menefee had not made bids after December 31, 2010 (Heberger did not verify that information). Heberger could not recall whether Menefee had done any paving projects in 2011 and 2012. Heberger "didn't do anything" to verify the accuracy of consolidated financial statements and income tax returns for the companies; rather, he relied upon information provided by the Menefees. He did not check the accuracy of the information provided by the Menefees.

Heberger had also testified about Menefee's overall damages, in an earlier arbitration proceeding involving Fresno County and Menefee Construction. Heberger was aware that Fresno County had to pay a monetary award to Menefee. In making his current calculations, Heberger did not attempt to differentiate between damages attributable to Fresno County and damages attributable to Vulcan. Heberger's theory was, whatever was not paid by Fresno County, had to be paid by Vulcan.

In the prior proceeding between Menefee and Fresno County, Herberger's analysis assumed that liquidation of the Menefee businesses would occur in 2012. No such liquidation occurred. On the contrary, the Menefees made new contributions to the company after 2012, which may have simply been returned to the partners as partner compensation or salaries, but Heberger did not investigate this aspect. Vulcan's counsel

asked Herberger: "And if there would have been a liquidation in 2012, based upon the evaluation you did for that year, then that would have reduced or eliminated some of these contributions or losses that occurred after that year, correct?" Herberger responded: "Yes." Herberger acknowledged that, for purposes of the Fresno County matter, he had opined that Menefee would be out of business at the end of that proceeding, irrespective of its outcome, and that various of Menefee's troubles were the result entirely of Fresno County's actions. Herberger combined Short-Term Rentals and Menefee Construction for purposes of his testimony in the Fresno County matter.

After Heberger finished testifying, Vulcan's counsel moved to strike his testimony. Counsel argued: "[Heberger] now comes in with an opinion of $3.9 million. So I am in a position where I either object and the court strikes it and we're left with $4.1 million, or I let the testimony come in which is favorable to us. That isn't fair to my client for this reason, your Honor. We have no idea what analysis he did for that $200,000. We weren't apprised of the different opinion, we weren't told about it in any way …. But the fact of the matter is that that puts me in a position that is unfair to the client. [¶] If this is going to be done, it should have been done a long time ago so that information is provided to us and we have an opportunity to determine why it's only $200,000. Should it be $500,000? Should it be some other figure? And for that to occur is one reason his testimony should be stricken." Counsel continued: "The second reason is, it doesn't comply with any legal standard for determining damages in a fraud case. It's a business valuation and a depreciation, or the reduction in the value of the business because of a speculative liquidated damage sale. And you can't find one case that says that that's the appropriate measure of damages for fraud." Counsel concluded: "So his testimony should be stricken for two reasons; the first, because it's a new opinion; and the second, because it doesn't comply with any model for damages for fraud."

Menefee's counsel responded: "As to the first argument, I mean, [Heberger] stated what his opinion was when I asked him. I thought he was going to put in the

$4.128 million as we talked about this morning." The court ruled: "At this point, I'm denying [the motion] without prejudice, which means I may come back tomorrow with a different opinion, but at this moment I'm going to deny it. I'm particularly concerned with the first basis. The second basis is also arguable, but I'm still doing research on that issue, so I can't definitively answer, so it is without prejudice, it is noted."

### (iv) Mike Menefee's Trial Testimony Regarding Academy Avenue Damages

As noted above, the court permitted the parties to give short opening statements at the start of the damages phase of the trial. Menefee's counsel addressed the anticipated testimony of Mike Menefee. Counsel stated: "Menefee had additional costs for the placement of the AC on Academy Avenue that they wouldn't have had if they had been able to pull the bulk of their materials out of the Fresno plant." Counsel continued: "And so [Mike Menefee] is going to show you he had a bid. The bid for that was approximately $4,500,000 some odd thousand dollars, and then he's going to show you another document that he's done which is essentially his direct cost report and for the placement costs, and that was approximately $5 million and some change. And the difference in between that is $455, 574.30, and that's what Menefee is claiming, and the evidence will show, is the part of the damages as a result of not being able to pull out of the Fresno plant as they had anticipated back when they were bidding this project in the first place."

Mike Menefee testified about the bid amounts for asphalt concrete leveling and asphalt concrete paving associated with the Academy Avenue project. He testified that the bid amount for asphalt concrete leveling was $120,211, and the total bid amount for asphalt concrete paving was $4,603,897. More specifically, he testified the two amounts collectively comprised the bid amount for asphalt concrete paving on the Academy Avenue project, which total was $4,724,108. Mike Menefee testified the latter number was "the total cost for the asphalt concrete paving" contemplated in the bid, not the full

39.

"bid number." He added: "This would have been the total cost of what we anticipated for the paving on Academy Avenue" for purposes of the bid. Mike Menefee further testified that his "direct cost report" indicated that the actual cost of "paving on Academy Avenue was $5,179,681.45." The difference between the anticipated cost of paving and the actual cost of paving was $455,573.45. On cross-examination, Mike Menefee acknowledged that various types of tractors, pickups, trucks, and other equipment for which the direct cost report listed cost amounts were actually owned by Menefee Construction and were fully paid off.

After Mike Menefee finished testifying, counsel for Vulcan addressed many problems with his testimony. Counsel argued: "Now, here, each and every piece of equipment, he believes have been paid [for,] it's own[ed] by Menefee Construction. So the fact is that they are not paying a rental charge for this equipment. If the equipment sat idle, there would be no different position with it sitting idle than it would be with respect to use on this particular job. There's no testimony about a depreciation in the accounting sense, but wear and tear or anything of that that creates a cost. So his whole premise of this $455,000 loss includes items for which there has been no expenditure out-of-pocket on behalf of Menefee." Counsel added: "So the situation we have here is, there's no financial loss that is attributable to this equipment. It taints the entire testimony of Mr. Menefee, because all he's talking about is the difference." Counsel objected to the documents on which Mike Menefee based his testimony, specifically the direct costs report, a voluminous and complex document, which had only been provided to Vulcan a few days earlier, in the middle of trial, in violation of the trial court's order regarding identification of exhibits. Vulcan also asked the court to strike Mike Menefee's testimony.

Menefee's counsel responded. He noted that Mike Menefee "talked about the bid" and "he talked about the job cost journal where the cost to pave the project" was reflected, "and the difference in those was the damages calculation." Vulcan's counsel

countered that the job cost journal includes numerous categories of extraneous costs, such as money spent on equipment, but no money was actually spent on the equipment because "the equipment is owned, it's paid for, there's no cost involved," nor were there any rental charges that had to be paid. To the extent the paving took longer than anticipated, with additional days expended, that would not include equipment costs for equipment that Menefee already fully owned.

The court expressed several concerns about Mike Menefee's testimony. The court stated: "All I have is equipment, and then he's giving a cost that it cost this much, when he already owned it anyway." In addition to the issue of bloated costs added to Mike Menefee's damages calculation, the court identified another problem. The court noted that Mike Menefee had not based his calculations on the specific number of days by which the Academy Avenue paving schedule was extended on account of Menefee pulling AC from Vulcan's Sanger plant. The court observed: "[Mike Menefee] didn't say extra days in his testimony." The court added: "[He said] this is the whole thing." The court continued: "I don't think it's a proper methodology of damages." The court concluded: "And – so at this point I'm most likely going to strike his testimony, because I don't find it to be proving any [relevant] element of damage.… It doesn't – it wasn't appropriately apportioned out so that anybody could figure out where they are going on it. That's my tentative on that."

Vulcan's counsel also pointed out the direct jobs report or job cost journal that Mike Menefee relied upon for his testimony as to the actual total cost of paving the Academy Project, was only identified as an exhibit and provided to Vulcan a few days ago, in the middle of trial. Menefee's counsel agreed that the direct jobs report/job cost journal was not included on Menefee's exhibit list and was provided to Vulcan only a few days ago (although it was part of a "much larger job cost journal and bid" that was produced in discovery). Vulcan's counsel then noted: "[This is] why we have been arguing on Mr. Menefee should not even be allowed to testify because we didn't have an

opportunity to [properly] cross-examine him or to take his deposition about the various issues that we're talking about now." Vulcan's counsel argued that, had the direct jobs report been timely identified and disclosed as a trial exhibit, Vulcan would have been able to cross-examine Mike Menefee "in detail." Counsel argued that, given the lack of notice, Vulcan was not able to flush out all potential issues with the document and therefore "any ambiguity should work against the plaintiffs."

The court ruled it was not going to admit Mike Menefee's daily costs journal into evidence because "the amount that's in there includes unrecoverable expenses [under any measure of damages]." The court further noted: "I can't let the whole document in because [Menefee] are including items that are unrecoverable damages." The court also said: "[The document also does not comply with] my normal rule which is on my web page and I talked about in the beginning of May that all exhibits are pre-marked before trial, none of that was followed. So I don't think you should be all that surprised that I'm not particularly happy that exhibits no one has seen are coming in three and a half weeks into a trial."

Menefee's counsel argued that Mike Menefee's testimony and the direct jobs report/job cost journal were evidence of damages under section 3333, the general measure of tort damages. The court responded: "Even if that's – even if we're going under 3333, which we may be, it's – I just don't know how we're necessarily going to write it. *It still doesn't change the fact that you can't have evidence of damages that were not really incurred under any theory.* You can't have damages that weren't incurred by anybody under tort, you can't have damages that weren't incurred by anybody for contract. I mean, you just can't." The court added: "[Y]ou have to have a basis for your damages."

Menefee's counsel sought to recall Mike Menefee as a witness in light of the court's decision to exclude the job cost journal. Menefee's counsel and the court had the following exchange:

"[COUNSEL]: … So [Vulcan's counsel is] objecting to the equipment costs, but then you are going to toss out the whole exhibit despite the fact that it shows damages in terms of the labor costs, and I don't think that's appropriate.

"THE COURT: It was your witness, it's your exhibit, it's your theory. If, for some reason, it doesn't have a basis and it gets thrown out, that is … nobody's fault. To try and alter an exhibit now, it just makes no sense to me. And to, well let me call [the witness] back. No. No. You had an opportunity, that's your case. You don't get to just keep going back because it's a different idea now."

Vulcan's counsel also reminded the court that Vulcan's motion to strike Heberger's testimony was still pending before the court.

### (v) Additional Discussions Between the Court and the Parties

The court and the parties then addressed the issue of the applicable measure of damages and appropriate jury instructions. The court stated: "All right. Then we come to the proposed jury instructions for what's remaining in the case, which is what is the measure of damages going forward. And as I stated several times, I don't really see where this case fits in terms of damages. I know you say [sections] 3333 and 1709,[26] and CACI does reference that in their fraud instructions, but their fraud instructions still are [No.] 1924. So I don't-- " Menefee's counsel argued that the damages Menefee was claiming were simply "past economic loss" damages. The court asked: "And what's your evidence that's been adduced at trial of past economic loss?" Menefee's counsel summed up the evidence Menefee had adduced: "Well, we talked about the business losses yesterday with Mr. Heberger, so essentially, the difference in the value of the businesses, as, you know from 2010 to 2015. He also talked about one, that Menefee essentially had to infuse $1.22 million into the company post-2010 to fund the company through the losses. We also talked about the differences, what we believe the differences

---

**26** Section 1709, which addresses damages for "deceit," provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

43.

between the Academy Avenue bid and the paving, that was $455,000. So we believe that those are past economic losses, should all go on the verdict form just in terms of past economic loss. That's the evidence." Vulcan pointed out that Heberger did not address causation and made clear "he wasn't the causation guy."

The court noted: "Yes, and that's what I was going to talk about today. Who is your causation guy? Because that's another problem I have with the evidence … in this case, is cause and proximate cause, because torts have that requirement in every element. So they have to – it has to be connected. And I don't see a connection between – I just don't see it. That because they misrepresented in the document that the asphalt concrete mix would comply with the specifications as set forth in Caltrans standard specifications number 39, and they didn't … as a result, Menefee went out of business? There's a lot missing in that there's a huge gap in evidence, and I just don't – I don't see any of that evidence in this case."

Menefee's counsel pointed to some evidence about generalized harm suffered by Menefee that was introduced in the liability phase. He noted that Jerry Menefee had testified that Menefee was sued by Fresno County and had defended that lawsuit with its working capital, which strategy had in turn impacted Menefee's bonding capacity. Jerry Menefee testified that Menefee's reputation suffered. Jerry Menefee also testified that Menefee stopped paying Vulcan for AC from the Sanger plant, for the Academy Project, on grounds of overcharging, prompting Vulcan to eventually stop supplying AC. In addition, Jerry Menefee had referenced "project overruns, because of Menefee's inability to pull [AC] out of the Fresno plant." Menefee's counsel added: "And Mr. Mike Menefee talked about how this was devastating to their company, and essentially how they have been blackballed out of the construction industry. And so that's the – that's the evidence that we have on causation." Menefee's counsel concluded: "And, you know, the jury found that there was harm. So, you know, and they, under a substantial factor analysis, they found that there was harm. So now it's just a question about the damages,

44.

about what those damages are.  So that's where I think the state of the evidence is.  [¶] And the question comes to [the court] about whether you believe there's sufficient evidence, as a matter of law."  Counsel concluded:  "And if no reasonable person, if your Honor thinks that no reasonable person would make that decision, then the court can determine that as a matter of law."

Vulcan's counsel responded:  "[Menefee] cannot close that causation gap, that your Honor is rightfully concerned with, that this Section 39 representation that was attached to the mix design that the County said we had to make, that we did make, that that was essentially responsible for them going out of business.  [¶]  They have, the only evidence that we just heard counsel talk about was what Menefee believed, that they believed that they did that.  But what we didn't hear was any evidence from the County saying, yeah, it was because [of] the materials.  So they can't square up the representation to the actual end result.  The County never made a move based on the materials." Vulcan's counsel continued:  "So if the County made a move based on workmanship, and they are talking about reputation, they are talking about blackballing, they are talking about the evidence that came in about Mike Menefee getting in fights with County inspectors [and] with the County experts, yeah, it is probably going to have an effect. And so they can't square up.  There's no direct link.  [¶]  I mean, if this case, if – if this was a case where it was completely, you know, wasn't speculative as to the reaction by the County in relation to the goods, that's one thing.  But we don't have that direct connection.  I mean, it is, there's just this morass, this huge chasm of lack of evidence to pinpoint that this representation means we have to buy their business.  I mean, especially when the County accepted the materials and the project went forward and they said it was, they said it was fine."  Counsel concluded:  "The liability aspect is only one part. You have to have damages."

45.

The court wrapped up the ongoing discussions with a final statement that touched on various aspects of its rulings over the prior days, in the course of multiple discussions with the parties, and also resolved any outstanding issues. The court stated:

> "Damages are an element of the tort of intentional misrepresentation, it is cited in [CACI] 1900 as an element, it is number 6, that he was harmed, and that it was a substantial factor in harm. So harm obviously is an element. The way to prove it is contained in 19 – the 1900 series. I do not find it to be contained in a general negligence theory.

> "Damages are an element. There are – there is no evidence in this trial thus far of damages in compliance with either out-of-pocket, [CACI No.] 1923, or [CACI No.] 1924. The amorphous tort standard isn't the law of damages for a fraud cause of action. Whether this is a travesty or not, I can't say. Counsel could have started with the instructions and put evidence together to establish a case in accordance with the CACI instructions, but that was not done.

> "Secondly, I have an issue with Mr. Heberger due to the fact he diametrically changed his testimony after testifying one way in the morning under [Evidence Code section] 402 hearing, comes back in the afternoon and completely changes all his calculations without telling anybody or giving any warning as to what he was going to do. *That's completely improper and unfair surprise*. So I find that to be another basis for essentially tossing out his entire opinion, so that's a second ground.

> "Third, Mike Menefee's testimony regarding additional daily cost overruns had substantial issues, due to the fact that his sheets contained equipment costs for rentals that the company owned, therefore, *they weren't actual damages anyway* [under any measure of damages], nor does that analysis fit necessarily into benefit of the bargain. It may have fit into out-of-pocket, but I can't even shoehorn it in there, especially in view of the fact that the sheet contains elements that wouldn't be recoverable [regardless of the applicable measure of damages]. *Additionally, apparently that exhibit was prepared and turned over last week, which is in the middle of a trial, which is inappropriate as well*, so I have issues with that.

> "Finally, on the causation element, I actually find that a reasonable person could not find that the damages the Menefees suffered were caused by an intentional misrepresentation as set out in Section 39 in the two letters. The testimony of Mr. Menefee on that issue was purely speculative.

Whether he was blackballed or not, I had no evidence from anybody, from the County saying what happened or why it happened. There wasn't any actual evidence. It was speculative and conclusory, so I find that not providing a proper mix design, a reasonable jury could not find that to be a substantial factor. So that's where we are." (Italics added.)

### (vi) The Court's Grant of Vulcan's Motion for Nonsuit as to Menefee's Intentional Misrepresentation Claims Regarding Both Projects

Critically, the court excluded Heberger's entire opinion testimony, on grounds that, when he finally testified before the jury in the damages phase of the trial, he suddenly changed his opinions as to Menefee's damages, testifying for the first time, that Menefee had suffered $3,973,000 in damages.[27] The court found Heberger's testimony was "completely improper" and constituted "unfair surprise," and excluded it in its entirety. Menefee does not challenge the exclusion of Heberger's testimony. Heberger's testimony encompassed the only evidence adduced by Menefee of specific business losses it allegedly suffered in connection with the Overlays Project.[28]

Secondly, the court in its final statement also echoed its earlier ruling excluding Mike Menefee's direct jobs report or daily cost journal, which documented costs associated with paving the Academy Project. The court had earlier ruled that Mike Menefee's direct jobs report/job cost journal was not admissible because it contained purported equipment costs that were not actually incurred by Menefee and therefore were not "recoverable" under any measure of damages, and, moreover, that Menefee would

---

[27] Heberger testified: "I computed that the Menefees' damages, excluding legal fees, are approximately $3,973,000."

[28] Menefee told the court, that the only witnesses who would testify on Menefee's behalf in the damages phase were Heberger, Mike Menefee, and Mark Reinhardt, who was Menefee's bonding agent. In his offer of proof regarding Reinhardt's testimony, Menefee's counsel stated that Reinhardt would testify as to the requirements of obtaining bonds for public works projects, as well as how he was "stretch[ing]" Menefee's financials to bond the company through April 2012 based on its 2010 financials, and thereafter, it would not have been able to secure bonds.

not be permitted to "alter" the direct jobs report/job cost journal in the middle of trial. The court had referenced additional grounds for exclusion at the time, specifically that the direct jobs report/job cost journal was belatedly identified as an exhibit and turned over to Vulcan only days before Mike Menefee testified in the damages phase; consequently, Vulcan was not able to properly cross-examine Mike Menefee with regard to the document (Vulcan had argued it also had been denied the opportunity to depose Mike Menefee on the issue of damages). In its final statement the trial court reiterated that the direct jobs report/job cost journal (1) had substantive irregularities, in that it encompassed purported equipment expenses that were not actually incurred by Menefee and were therefore not recoverable under *any* measure of damages; and (2) was belatedly identified and turned over to the other side as an exhibit (a lapse the court termed "inappropriate"). In short, the court's final statement was consistent with and cemented its earlier comments indicating it was striking the direct jobs report/job cost journal on these grounds.[29]

In its final statement, the court further noted that Mike Menefee's testimony relied on the improper and inadmissible direct jobs report/job cost journal, indicating his testimony was therefore stricken as well. Indeed, since Mike Menefee's testimony was based on the direct jobs report, it necessarily incorporated the substantive improprieties reflected in that document (as identified by the court); moreover, with the document excluded, Mike Menefee's testimony had no foundation.[30] In short, in its final statement,

---

[29] The court, in its final statement, specifically reiterated that the late identification and disclosure of the job cost journal as an exhibit was "*inappropriate*." (Italics added.) The court's statement suggests the court doubled down on its earlier ruling to strike the job cost journal; there was no other reason for the court to highlight this point.

[30] While the court's rulings were made piecemeal over time and are not a model of clarity, the most reasonable interpretation of the record is that the court struck the direct jobs report/job cost journal and Mike Menefee's testimony. Further, on appeal, we consider the record in the light most favorable to the judgment, and, under that standard,

the court confirmed its earlier, tentative ruling striking Mike Menefee's testimony regarding damages incurred by Menefee, in part because he had included in his calculation of damages, the improper equipment expenses reflected in the direct jobs report/job cost journal.[31]

Given the import of the court's rulings, Vulcan moved for nonsuit as to Menefee's fraud claims for damages as to both projects. The trial court granted Vulcan's motion for nonsuit.

Menefee's attorney stated: "[I]f the court felt it required clarification from the jury as to its finding of fraud, the judge could attain [a] more certain verdict before the jury was discharged, and if the judge agrees, the jury can be sent back to address that issue." The court responded: "I'm going to deny the request."

### B.    Analysis

Menefee's primary challenge on appeal is to the trial court's grant of Vulcan's motion for nonsuit as to Menefee's fraud claims, at the conclusion of Menefee's case. We affirm.

A motion for judgment of nonsuit is a motion made after the plaintiff's opening statement, or after the plaintiff has presented his or her evidence. (Code Civ. Proc., § 581c, subd. (a).) The motion concedes the truth of the facts asserted (if made after the opening statement) or shown (if made after the presentation of the plaintiff's evidence), but claims they fail as a matter of law to support the plaintiff's cause of action. (*Gray v. Kircher* (1987) 193 Cal.App.3d 1069, 1071.) "A defendant is entitled to a nonsuit if the

---

we have no difficulty concluding the court struck the direct jobs report/job cost journal and Mike Menefee's testimony.

[31]    In making its tentative ruling to exclude Mike Menefee's testimony, the court had also noted that his testimony did not reflect "a proper methodology of damages," as he failed to consider how many additional paving days were required as a result of Menefee pulling AC from Vulcan's smaller Sanger plant rather than the larger Fresno plant and to apportion cost overruns in light of the actual number of additional paving days.

trial court determines that, as a matter of law, the evidence presented by [the] plaintiff is insufficient to permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

When the motion is made after the plaintiff has presented his or her evidence, the standards for granting it are the same as the standards applicable to a motion for a directed verdict or for reversing a judgment on appeal based on a lack of substantial evidence:

> "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trail court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury…. In other words, the function of the trial court on a motion for a directed verdict [or nonsuit] is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge … the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict [or nonsuit]." (*Estate of Lances* (1932) 216 Cal.397, 400-401; see *Carson v. Facilities Development Co*. (1984) 36 Cal.3d 830, 838-839.)

The substantial evidence needed to defeat the motion is "evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M*. (1997) 59 Cal.App.4th 289, 298.) A mere scintilla of evidence or evidence that is bare speculation or conjecture is not enough; rather, there must be some substance to the

evidence upon which a reasonable person could rely. (*Nally v. Grace Community Church*, *supra*, 47 Cal.3d at p. 291.) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

We review a judgment of nonsuit de novo, applying the same standards as the trial court. (*Nally v. Grace Community Church*, *supra*, 47 Cal.3d at p. 291; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060.)

For a showing of "fraud," there must be a representation of material fact made falsely—either knowingly or recklessly so, or without reasonable ground for believing it true—to induce a party to act, and that party relied upon it, and incurred damages through its reliance thereon. (*Wheat v. McNeill* (1931) 111 Cal.App. 72, 78; *Hobart v. Hobart Estate Co*. (1945) 26 Cal.2d 412, 422; *Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 173.) The question before us is whether plaintiffs presented substantial evidence in support of the damages element of their fraud causes of action regarding the Overlays and Academy Projects, respectively.

As a preliminary matter, Menefee argues the measure of damages applicable to the instant matter was that set forth in sections 3333 and 1709, under which statutes a tort plaintiff is entitled to any damages proximately caused by the defendant's tortious conduct. Menefee contends it was not limited to damages under either the out-of-pocket or benefit-of-the-bargain rules. However, the measure of damages is ultimately immaterial because, even assuming the applicable measure of damages was the general measure of tort damages as set forth in section 3333, the trial court properly granted nonsuit on Menefee's fraud claims for damages. Indeed, the trial court noted that Menefee had not established damages under any measure of damages. When Menefee's counsel argued that the correct measure of damages was section 3333, the court had

51.

emphasized: "*It still doesn't change the fact that you can't have evidence of damages that were not really incurred under any theory.* You can't have damages that weren't incurred by anybody under tort, you can't have damages that weren't incurred by anybody for contract. I mean, you just can't." (Italics added.) The court added: "[Y]ou have to have a basis for your damages." For purposes of our analysis, we assume, without deciding, that the applicable measure of damages was the general tort measure set forth in section 3333.

### (i) Issue of Menefee's Damages in Connection with the Overlays Project

Menefee called Heberger to testify to its damages in connection with the Overlays Project. However, as discussed above, the trial court struck Heberger's testimony in its entirety. Therefore, there was *no* evidence of any business losses suffered by Menefee with respect to its damages claim as to the Overlays Project. Menefee therefore simply failed to establish that it suffered losses or damages as a result of Vulcan's conduct on the Overlays Project.

Nor does the limited and generalized testimony from Jerry Menefee and Mike Menefee, in the liability phase of the trial, to the effect that Menefee's bonding capacity had been impaired and Menefee's reputation had suffered on account of the litigation with Fresno County, assist Menefee. Menefee contends that this testimony established that the business losses testified to by Heberger were caused by Vulcan's conduct (Heberger emphasized he did not consider causation and further testified he simply assumed Menefee had to liquidate). However, as the trial court noted, the testimony of Jerry Menefee and Mike Menefee regarding impairment of Menefee's bonding capacity and reputation on account of the litigation with Fresno County, consisted of bare, conclusory statements that could not support an award of business loss damages based on Vulcan's certification letter as to RAP AC from its Fresno plant, for the Overlays Project.

In light of the conclusory nature of the testimony of Jerry Menefee and Mike Menefee and Heberger's affirmation that he simply *assumed* Menefee had to liquidate, the trial court correctly found that, as a matter of law, a reasonable jury could not find that Vulcan's misrepresentation in the context of the Overlays Project was a substantial factor in causing the *specific* business loss damages claimed by Menefee via Herberger's testimony. (See *Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 ["Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty."]; *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132 ["A 'complete causal relationship' between the fraud or deceit and the plaintiff's damages is required'"]; *In re Easterbrook* (1988) 200 Cal.App.3d 1541, 1544 ["damages may not be based upon sheer speculation or surmise, and the mere possibility or even probability that damage will result from wrongful conduct does not render it actionable"], overruled on other grounds by *People v. Romero* (1994) 8 Cal.4th 728, 744, fn. 10.)

In any event, given that the court struck Heberger's testimony, resulting in a total lack of evidence of business losses suffered by Menefee, any damages awarded by the jury for business losses would be entirely speculative. (*Block v. Tobin* (1975) 45 Cal.App.3d 214, 219 ["Damages are not recoverable if the fact of damage is too remote, speculative or uncertain."]; *Moore v. Teed* (2020) 48 Cal.App.5th 280, 292 [" 'Whatever its measure in a given case, it is fundamental that "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." ' "].)

We conclude that, in the complete absence of a showing of business losses suffered by Menefee, there was no legal basis for the jury to award damages to Menefee, in connection with the Overlays Project. (*Valdez v. Taylor Auto. Co.* (1954) 129 Cal.App.2d 810, 821 ["A plaintiff is required, as a general rule, to have sustained an actual detriment from the particular injury of which he complains before he can be compensated for its infliction."].)

In sum, although there was a jury verdict on liability, there was no legal or evidentiary basis for the jury to award damages to Menefee for Vulcan's misrepresentation as to the RAP AC it supplied for the Overlays Project. The court therefore properly granted nonsuit as to the fraud claim for damages related to the Overlays Project. (See *Billings v. Farm Development Co.* (1925) 74 Cal.App.254, 259 ["[i]t is axiomatic that fraud without damage is not actionable"]; *Machado v. Machado* (1944) 66 Cal.App.2d 401, 405 ["Fraudulent misrepresentations without damage do not support an action."]; *Hill v. Wrather* (1958) 158 Cal.App.2d 818, 825 ["Deception which does not cause loss is not a fraud in the legal sense."]; *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1016-1017 [" ' "Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages." ' "]; *Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818 ["Deception without resulting loss is not actionable fraud."]; *Stephenson v. Argonaut Ins. Co.* (2004) 125 Cal.App.4th 962, 974 [same]; *Edward Barron Estate Co. v. Woodruff Co.* (1912) 163 Cal. 561, 571 ["It is fundamental, of course, that no matter what the nature of the fraud or deceit, unless detriment has been occasioned thereby, plaintiff has no cause of action."].)

Menefee's arguments on appeal as to evidence of damages regarding the Overlays Project largely depend on Heberger's testimony. However, since the trial court struck Heberger's testimony and Menefee does not challenge that ruling, Menefee's arguments are misplaced.

### (ii) Issue of Menefee's Damages in Connection with the Academy Project

The trial court also properly granted nonsuit as to Menefee's fraud claim for damages in relation to the Academy Project. Menefee's theory of damages as to the Academy Project was also very convoluted. The evidence showed that the mix design for the RAP AC from Vulcan's Fresno plant for the Academy Project complied with the 2009 Caltrans standards (the 2006 Caltrans standards were not entirely compatible with

54.

RAP AC). Vulcan's certification letter regarding the RAP AC from its Fresno plant, for the Academy Project, stated that the RAP AC would comply with Caltrans standard specifications (the letter did not specify the year of the standard specifications in question). The test strip laid for the Academy Project with RAP AC from the Fresno plant failed on account of compaction issues. At the time, the County was also complaining about paving issues on parts of Auberry Road and Dinkey Creek Road. Given the failure of the test strip as well as the County's complaints, Menefee decided to begin paving the Academy Project with AC from Vulcan's smaller, Sanger plant, until the County verified a new RAP AC mix design for the Academy Project. The County took five or six months to verify the new mix design, resulting in a longer paving schedule for the Academy Project and, in turn, increased costs to Menefee. Menefee's theory was that the increased costs incurred by Menefee as a result of the longer paving schedule were proximately caused by Vulcan's certification letter as to the RAP AC from its Fresno plant, for the Academy Project.

Mike Menefee testified, in the damages phase, as to Menefee's damages related to the Academy Project. He testified as to Menefee's bid cost for paving the Academy Project and, based on his direct jobs report/job cost journal, also testified to the purported amount Menefee ultimately paid to accomplish paving the Academy Project. Mike Menefee testified that Menefee's damages on the Academy Project were the difference between these figures. The trial court pointed out that the difference between those aggregated figures did not properly capture the additional costs incurred as a result of delays necessitated by pulling AC from Vulcan's smaller, Sanger plant. We agree with the trial court's reasoning that the difference between Menefee's bid costs for paving the Academy Project and the amount Menefee ultimately paid to accomplish paving the Academy Project, is far too broad and tenuous a measure to reflect the additional costs incurred as a direct result of pulling AC from Vulcan's Sanger plant rather than its Fresno plant.

For one thing, bid costs are merely proposed costs that are estimated well in advance of the work being carried out and are inherently tentative and subject to change. Moreover, the figure proposed by Mike Menefee was not reasonably tailored to capturing the costs arising from extra paving time attributable to the smaller daily output of the Sanger plant as compared to the Fresno plant. Indeed, as the trial court aptly observed, Mike Menefee's testimony was not based on "a proper methodology" for calculating the damages sought. Therefore, Menefee's claimed damages as to the Academy Project, as described by Mike Menefee, were speculative, such that no reasonable jury could find they were related to Vulcan's certification letter for RAP AC for the project.

Furthermore, as discussed above, the court struck, for multiple reasons, the direct jobs report/job cost journal underlying Mike Menefee's testimony, requiring, in turn, the exclusion of his testimony as well. Not only did the court rule the document included costs Menefee did not incur, but the court noted the document was belatedly identified as an exhibit and could not be altered at that late stage. Consequently, Menefee failed to provide appropriate evidence of *any* costs it actually incurred as a result of a longer paving schedule necessitated by pulling AC from Vulcan's smaller, Sanger plant. In the absence of such evidence, any damages awarded by the jury on account of a delayed paving schedule would have been entirely speculative.[32] Thus, although there was a jury

---

[32] Nor was it established that delays on account of other factors did not play a role in the longer paving schedule for the Academy Project. (*Express, LLC v. Fetish Group, Inc.* (C.D. Cal. 2006) 464 F.Supp.2d 965, 972 [no liability for fraud attaches under California law when damages were due to unrelated causes].) In fact, evidence adduced during the trial on Vulcan's cross-complaint showed that Menefee had sued the County of Fresno for delay damages allegedly sustained by Menefee with respect to the Academy Project, including delays caused by the County's failure to timely approve an AC mix design and the County's failure to timely relocate utilities on the project. In that context, Mike Menefee was asked about delays that occurred on the Academy Project. Specifically, he was asked: "What … issues [other than the delays related to the County's approval of the mix design] caused delays on that project?" Mike Menefee responded: "Just utilities caused delays, impaction delays, there was delays due to the utilities with the pipelines that was in addition to the utilities that were in the way. The major delay on that project

56.

verdict on liability, in connection with the Academy Project, there was no legal basis for the jury to award damages to Menefee. The court, therefore, properly granted nonsuit on Menefee's fraud claim for damages related to the Academy Project.

Menefee argues that since there was evidence, in the liability phase, that Menefee's paving schedule on the Academy Project had been extended, requiring additional labor and other costs, the court should have given the case to the jury even in the absence of evidence of Menefee's actual damages, so Menefee could have recovered nominal damages. However, nominal damages are not generally recoverable for fraud. As damages are essential to a claim for fraud, "nominal damages are not awarded in deceit." (Prosser and Keeton on Torts, § 110 (5th ed. 1984; see *Furia v. Helm* (2003) 111 Cal.App.4th 945, 956.) In exceptional instances, where a determination of damages is not possible, a case might be made for nominal damages. However, Menefee does not argue, and has not shown, that damages arising from an extended paving schedule necessitated by the limited supply of AC from Vulcan's Sanger plant (as compared to its Fresno plant) were not ascertainable. Rather, Menefee simply failed to adduce proper evidence on the point. In these circumstances, nominal damages were not available.

In addition, Menefee argues the trial court improperly denied Menefee's request to recall Mike Menefee to testify in the damages phase of the trial. First, we note Menefee made the request to recall Mike Menefee after the court struck the job cost journal, well before Vulcan moved for nonsuit. At the time, Menefee did not provide an offer of proof to the court as to Mike Menefee's anticipated testimony on recall. Menefee did not renew the request in the context of the motion for nonsuit. Second, during the damages phase, Vulcan's counsel brought to light numerous procedural irregularities on Menefee's

---

was, one of the major delays we went out with Fresno County, was for the utilities." He added: "The utilities were not – the utilities are supposed to be relocated, but were not relocated properly. So we had to skip through the project and build segments, different segments than what we had scheduled."

57.

part, such as Menefee's repeated failure to timely provide its proposed exhibits to Vulcan, among other issues. Under the circumstances, we cannot say the trial court erred in denying Menefee's request to recall Mike Menefee.

Menefee further argues, for the first time, that had it been allowed to recall Mike Menefee, the latter could have testified along the lines he testified in the final phase of the trial, in which Vulcan's cross-complaint was at issue. In the trial on Vulcan's cross-complaint, Mike Menefee testified that Caltrans sets certain equipment rates that serve as an industry accounting standard. However, the court had previously ruled that Mike Menefee was permitted to testify only as a percipient witness in the damages phase. As a percipient witness, Mike Menefee could not testify to Caltrans' accounting procedures. Furthermore, the trial court had struck Mike Menefee's direct jobs report/job cost journal on multiple grounds, including the fact that it was belatedly identified as an exhibit and turned over to Vulcan. Mike Menefee would therefore not have been permitted to testify to the contents of the direct jobs report/job cost journal on recall.

Finally, Menefee suggests, in its reply brief, that the trial court was required to send to the jury, the matter of damages arising from the price dispute concerning AC from the Sanger plant for the Academy Project. However, Menefee did not introduce evidence of the actual damages arising from this price dispute, whereby any award of damages in this regard would be purely speculative. Furthermore, as a matter of law, the proximate cause of any damages in this regard would be the price actually charged by Vulcan for the AC from its Sanger plant (Vulcan offered Menefee a discount) and/or the price actually paid by Menefee (Jerry Menefee testified he self-discounted payments made for AC from the Sanger plant for the Academy Project, and ultimately stopped paying altogether), rather than any misrepresentation made by Vulcan in connection with the Academy Project. (See *Roberts v. Karr* (1960) 178 Cal.App.2d 535, 542-543; *Service by Medallion, Inc. v. Clorox Co*., *supra*, 44 Cal.App.4th at p. 1818 ["to recover for fraud

58.

… the plaintiff must … prove the 'detriment proximately caused' by the defendant's tortious conduct"].)

### (iii) Menefee's Punitive Damages Claim

Our resolution of Menefee's challenge to the trial court's grant of nonsuit on Vulcan's fraud claims for damages renders moot Menefee's challenge to the trial court's dismissal of its punitive damages claim.[33]

## II. Vulcan's Cross-Complaint

After the trial court granted nonsuit on Menefee's fraud claims, the trial court discharged the jury, having decided the court would try the matter of Vulcan's cross-complaint itself. The court ultimately found in favor of Vulcan and, in turn, judgment was entered in favor of Vulcan as to the cross-complaint. Menefee argues the trial court erred in denying Menefee its constitutional right to jury trial in the matter of the cross-complaint, requiring reversal of the judgment. We agree and will remand the matter for a retrial only as to Vulcan's cross-complaint.

### A. Background

Vulcan's cross-complaint raised contractual claims and Menefee's answer asserted various affirmative defenses, including unclean hands. Essentially, Vulcan sought payment for AC from its *Sanger* plant that was supplied to Menefee for the *Academy Project*. The cross-complaint related to the Academy Project only. Menefee does not dispute that payment was outstanding for AC from Vulcan's Sanger plant that was used to pave the Academy Project. Menefee, however, asserts that Vulcan was not entitled to

---

[33] We also note the general rule that " '[a]ctual damages must be found as a predicate for exemplary damages,' " and that "punitive damages are never more than an incident to a cause of action for actual damages, and, when allowed, are allowed only in addition to recovered actual damages." (*Mother Cobb's Chicken Turnovers, Inc. v. Fox* (1937) 10 Cal.2d 203, 205-206; 6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1780 ["it is settled in California that punitive damages cannot be awarded unless actual damages were suffered, the theory being that they are in addition to compensatory damages"].)

relief because it had unclean hands, on account of a misrepresentation regarding the mix design for RAP AC from its *Fresno* plant for the Academy Project (*no* RAP AC from Vulcan's Fresno plant was used to pave the Academy Project). The AC for the Academy Project was provided to Menefee on the basis of a preexisting credit agreement between Menefee and Vulcan that dated to 2005. Vulcan's last invoice for the Academy Project showed an outstanding balance of $1,159,797.05.

The trial court and the parties discussed the mechanics of the trial on Vulcan's cross-complaint. Vulcan waived its right to jury trial on the cross-complaint. Menefee did not waive its right to jury trial on the cross-complaint. The parties agreed that Menefee's unclean hands defense was an equitable defense. Menefee argued it had legal defenses in addition to the equitable defense of unclean hands. The court ruled that the court would try the cross-complaint and the affirmative defenses. The court concluded: "So it would be more streamlined and more efficient if I decided, so that's not going to the jury." The matter proceeded to a short court trial on the cross-complaint. The parties identified multiple facts on which testimony was previously admitted, as well as multiple exhibits that had previously been admitted, as relevant evidence to be considered by the court in its role as the finder of fact. In addition, each side presented witness testimony.

Vulcan called two witnesses: Angela Bailey and Marcos Galaviz. Angela Bailey, Vulcan's Division Credit Manager, testified about the 2005 credit agreement between Vulcan and Menefee as well as the stop notice and bond claim that Vulcan eventually issued on the Academy Project. Bailey explained: "We actually submitted a stop notice to the County of Fresno letting them know we hadn't been paid and we wanted them to set aside the money that's due to us from any contract money that was owed to Menefee. The same thing with the surety. We sent a notice to the surety letting them know we hadn't been paid and we were filing the claim against the payment bond." Bailey testified the balance owed was $1,159,797.05.

Marcos Galaviz, Vulcan's sales representative on the Academy Project, also testified. Galaviz testified that he quoted the prices for AC to Menefee for purposes of the Academy Project; Galaviz said he quoted "$44 out of Sanger and $41 out of Fresno." He was asked why the prices for AC from the two plants were different. Galaviz answered: "There's many reasons why. One was the cost difference from the two plants. Our Fresno plant was high production, state of the art, efficient cost, cheaper cost. Sanger, older plant, lower production, has a more expensive operating cost." Galaviz said Vulcan did not make more money on the Academy Project as a result of Menefee pulling AC out of the Sanger plant. He explained this was so "[b]ecause [Vulcan's] Sanger plant, [the] production costs are a lot more expensive than they are out of Fresno." Galaviz understood that Menefee had initially planned to pull most its material from the Fresno plant. Galaviz offered Menefee a price reduction for AC from the Sanger plant, to $43 per ton, to apply prospectively from June 22, 2010, until Fresno County approved a new, pending mix design for the Fresno plant.

Menefee called one witness, Mike Menefee. A test strip laid for the Academy Project using RAP AC from the Fresno plant had failed; the letter from the County explaining the failure stated that the test strip was not accepted on account of compaction issues. Mike Menefee testified the County used improper methods for assessing compaction. The County did not give Menefee a change order. The County also took until November 2010 to approve a new RAP AC mix design for the Fresno plant, at which point most of the Academy Project was completed. Menefee was unable to pull RAP AC from the Fresno plant at that point because of scheduling conflicts. Mike Menefee further testified that Fresno County did not make a warranty claim against Menefee with regard to the Academy Project.

Mike Menefee testified that it took longer to pave the Academy Project than anticipated at bid time as the Sanger plant produced less AC per day than the Fresno plant. Mike Menefee acknowledged that Menefee had sued Fresno County for causing

delays on the Academy Project, including by failing to timely approve a new mix design and by failing to timely relocate utilities on the project. He noted: "[O]ne of the major delays we went out with Fresno County, was for the utilities." He further explained: "The utilities were not – the utilities are supposed to be relocated, but were not relocated properly. So we had to skip through the project and build segments, different segments than what we had scheduled." Mike Menefee said Vulcan had nothing to do with the County's failure to properly relocate the utilities.

The court ruled in favor of Vulcan and issued a statement of decision.[34] The court awarded $1,159,797.05 as contract damages to Vulcan, with $900,000 interpled by the County pursuant to Vulcan's stop notice and $259,797.05 owed by Menefee.

The court analyzed the evidence and found that the terms of the contract between Vulcan and Menefee required Vulcan to supply AC materials for the Academy Project at "$41/ton out of Vulcan's Fresno [p]lant and $44/ton out of Vulcan's Sanger plant." The court reasoned: "Although Menefee claims that the price was actually the same out of both plants that contention does not comport with the evidence. As set forth in Trial Exhibit 104, on June 25, 2010, Mr. Galaviz sent a letter to Menefee reducing the price for asphalt pulled out of Sanger by one dollar. No response to that letter was received into evidence at trial. Instead, on July 20, 2010, Jerry Menefee sent a letter to Vulcan 'discounting' the price for the asphalt from the Sanger plant 'due to the fact your Fresno Plant was unable to supply in spec material at lower quoted price.' If Menefee believed the price was the same at both plants, the July 20 letter would have been unnecessary. Any reasonable person would have either challenged Galaviz when he said he was reducing an already equal price or would have stated in the July letter that the price was

---

[34]     In denying a subsequent motion for reconsideration by Menefee, the court reiterated and expanded on its reasons for finding in favor of Vulcan.

the same; not that it was being 'discounted due to an inability to supply in spec material at lower quoted price.'"

The court further found that Vulcan had "substantially performed" what the contract required. The court explained: "CACI [No.] 312 requires evidence that Vulcan made a good faith effort to comply with the contract, that Menefee received essentially what the contract required, and, if there was a failure, any alleged failure was trivial or unimportant." The court noted: "Menefee knew it was receiving material out of Vulcan's Sanger plant for the Academy Avenue Project. Menefee unconditionally accepted all of the … asphalt concrete that had been verified and approved by the County of Fresno out of Sanger."

In addition, the court found that "the evidence establishes that Vulcan was not responsible" for any delays that occurred on the project. The court reasoned that the certification letters regarding AC for the Academy Project, from Vulcan's Fresno and Sanger plants, respectively, were sent to Menefee on December 8, 2009. Thereafter, in late April 2010, Menefee paved a test strip for the Academy Project using materials out of Vulcan's Fresno plant that failed largely due to compaction issues. The court continued: "The County and Menefee then had a series of disputes regarding the failed test strip and Menefee's request for a change order which the County refused to provide.… Vulcan resubmitted bin percentages and aggregate materials to the County but the County did not start its approval process until July 20, 2010, and it wasn't until November 2010 that the County verified the mix design.… Additionally, the project was delayed due to the County's failure to relocate utilities.… These delays were in no way attributable to Vulcan. In fact, Menefee sued the County for damages caused by the County's delay.… There is no evidence to support Menefee's contention that the misrepresented mix design caused any of the damages Menefee alleges it suffered." The Court concluded: "Vulcan substantially performed on the contract."

The court noted that "Menefee does not contest that it obtained materials from Vulcan's plants for the Academy Avenue Project and was invoiced for the same. Menefee also admits it has not paid for all of the asphalt it used on the project." The court further observed: "Menefee has not paid in full for the product it received. Vulcan has submitted evidence that it has unpaid invoices in the amount of $1,159,797.05 for materials provided to and accepted by Menefee Construction." The court found the amount remained unpaid. The court concluded: "Vulcan succeeds on its Breach of Contract claim for $1,159,797.05."

The court also considered Menefee's affirmative defense of unclean hands, an equitable defense. The court found that the unclean hands defense was unavailable as a matter of law. In the alternative, the court considered the propriety of the unclean hands defense on the facts and rejected it. The court's reasoning is set forth both in its statement of decision and in a subsequent order on Menefee's motion for reconsideration of the issue (the latter order specified it was "intended to supplement" the "previously issued [s]tatement of [d]ecision").

### B.    Analysis

#### (i)    Menefee was Constitutionally Entitled to Trial by Jury on Vulcan's Cross-Complaint

As noted above, Menefee argues it was constitutionally entitled to a jury trial on the contractual claims in Vulcan's cross-complaint. We agree.

The issue of whether a party is constitutionally entitled to a jury trial is a question of law that we review de novo. (*Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 904.)

" 'The right to trial by jury is a basic and fundamental part of our system of jurisprudence. [Citations.] As such, it should be zealously guarded by the courts [citation]. In case of doubt therefore, the issue should be resolved in favor of preserving a litigant's right to trial by jury. [Citations.]' [Citations.] Denial of the right to trial by

64.

jury is an act in excess of the court's jurisdiction and is reversible error per se." (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 862-863 (*Van de Kamp*), quoting *Byram v. Superior Court* (1977) 74 Cal.App.3d 648, 654.)

The Constitution guarantees a jury trial in actions triable by jury at common law. (Cal. Const., art. 1, § 16; *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8 (*C & K Engineering*).) "Generally speaking, this means that *legal* as distinguished from *equitable* actions are triable by jury." (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 94, p. 113; see also *C & K Engineering*, *supra*, 23 Cal.3d at p. 8 ["As a general proposition, '[T]he jury trial is a matter of right in a civil action at law, but not in equity.'"].)

"In classifying an action as legal or equitable, the court will look to its substance, i.e., to the nature of the right involved and the remedy sought. The label or title of the complaint is never controlling." (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 117, p. 183.) The court must examine the pleadings in the action to "determine whether the case is at law or equity, or a combination of both." (3 Witkin, *supra*, Actions, § 116, p. 182.) " ' "[T]he court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law." ' " (*C & K Engineering*, *supra*, 23 Cal.3d at p. 9.)

"The fact that trial by jury is jealously preserved as a matter of right dictates that the mere existence of a remedy in equity cannot operate to defeat a right to proceed at law. It is only where the issues to be tried are exclusively equitable in nature that a suitor is deprived of a right to a jury trial." (*Ripling v. Superior Court* (1952) 112 Cal.App.2d 399, 408 (*Ripling*) [incompetent's guardian sued alleged trustee/fiduciary for money had and received, and prayed for accounting, declaration of constructive trust, and money judgment; defendant was entitled to jury trial because plaintiff essentially elected to sue on contract-based debt].) "[E]quitable principles may be applied in an action at law

without changing the character of the action." (3 Witkin, *supra*, Actions, § 118, p. 185, citing *Raedeke v. Gibralter Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 (*Raedeke*).)

Lawsuits for breach of contract, money due under a contract or statute, money damages in tort, injuries to person, reputation, or property, and quasi-contractual obligations and restitution are legal actions. (7 Witkin, *supra*, Trial, § 94, p. 114 [citing cases]; see also Code Civ. Proc., § 592 ["In actions … for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury."]; *Ceriale v. Superior Court* (1996) 48 Cal.App.4th 1629, 1634 ["There is a jury trial right on the contract breach cause of action."].)

Here, Vulcan's cross-complaint was an action for breach of contract and money due under a contract, wherein relief pursuant to the contract would provide a full and complete remedy. (*Baugh v. Garl* (2006) 137 Cal.App.4th 737, 740 ["Whether the action is legal or equitable is ordinarily to be determined by the type of relief to be afforded."]; *Ripling*, *supra*, 112 Cal.App.2d at p. 409 [where a court of law can accord complete relief, the action is one at law].) Hence, the claims were clearly and exclusively legal in nature. (See *Ford v. Superior Court* (1959) 176 Cal.App.2d 754, 759 [the fact that a defendant asserts equitable defenses, including unclean hands, to an action at law for breach of contract, "will not change [the action] to an action in equity"].)

Furthermore, the present matter involved disputed factual questions, such as, what was the agreed-upon price for AC from Vulcan's Sanger plant for the Academy Project, whether Vulcan had substantially performed on the contract, whether Jerry Menefee accepted Vulcan's offer to discount the price of AC from Vulcan's Sanger plant by one dollar, and what was the amount that Menefee still owed Vulcan for AC supplied pursuant to the credit agreement between Menefee and Vulcan. The trial court's statement of decision reflects that the court made several factual findings, including as to the issues identified above and the existence of Vulcan's stop notice, and ultimately awarded Vulcan $1,159,797.05 in contract damages.

Menefee specifically and timely invoked its right to jury trial as set forth in Menefee's brief on the issue to the trial court and described in its opening brief in this court. Vulcan does not dispute any of Menefee's representations in this regard. Therefore, Menefee neither expressly nor impliedly waived its right to a jury trial on Vulcan's cross-complaint. (See Code Civ. Proc., § 631, subds. (a), (f).) Accordingly, Menefee was constitutionally entitled to trial by jury as to the claims in Vulcan's cross-complaint. We reverse the judgment as to Vulcan's cross-complaint and remand the matter for further proceedings consistent with this opinion.[35]

### (ii) The Trial Court Properly Decided Menefee's Unclean Hands Defense

The trial court properly decided Menefee's affirmative defense of unclean hands, an equitable defense. (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 640 (*CrossTalk Productions*) ["Unclean hands is an equitable doctrine."]; *Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 432 [same].) In contrast to legal claims, equitable defenses are generally tried by the court, although the court has the discretion to submit an equitable defense to the jury. (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 621-622 (*Unilogic*).) Here, the court properly exercised its discretion to itself adjudicate Menefee's equitable claim of unclean hands. The trial court rejected Menefee's unclean hands defense. We affirm.

Whether the unclean hands doctrine can be applied to a particular transaction is a legal issue reviewed de novo. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274.) Once it is determined that the unclean hands doctrine applies, the standard of review has been alternately described as abuse of discretion (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447 (*Dickson*); *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48,

---

[35] To the extent Vulcan argues the court's decision on the cross-complaint was the equivalent of a judgment on the pleadings, the argument is cursory and not properly developed. We are not persuaded.

55) and substantial evidence (*California School Employees Assn., Tustin Chapter No. 450 v. Tustin Unified School Dist.* (2007) 148 Cal.App.4th 510, 521.)  Unclean hands has also been described as a question of fact.  (*CrossTalk Productions*, *supra*, 65 Cal.App.4th at p. 639; *Unilogic*, *supra*, 10 Cal.App.4th at p. 620; *Insurance Co. of North America v. Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306.)

We have synthesized these standards to apply an abuse of discretion standard to the trial court's decision whether to uphold or reject an unclean hands defense and the substantial evidence standard to the trial court's factual findings.  (See *Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109.)  However, if the trial court's factual findings are supported by substantial evidence or if the underlying facts are undisputed, the question of whether the unclean hands doctrine is applicable is decided as a matter of law.

"The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."  (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)  The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff in connection with the matter in controversy.  (*General Elec. Co. v. Superior Court* (1955) 45 Cal.2d 897, 899-900; *Dickson*, 83 Cal.App.4th at p. 446.)  "Unclean hands applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action."  (*Fladeboe v. American Isuzu Motors, Inc*. (2007) 150 Cal.App.4th 42, 56.)  " 'Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries.' "  (*Ibid*.)

The conduct constituting unclean hands must affect the transaction at issue in the litigation or the equitable relationship between the parties.  (See, e.g., *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 820 ["The focus is the equities of the relationship between the parties, and specifically whether the unclean hands affected the transaction at

issue."]; *Brown v. Grimes*, *supra*, 192 Cal.App.4th at p. 282 ["the improper conduct must be 'in the particular transaction or connected with the subject matter of the litigation that is a defense'"]; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 680 ["It has long been held that the misconduct asserted in an unclean hands defense must be sufficiently related to the matter currently before the court."].) Past misconduct or past misconduct that only indirectly affects the matter before the court is insufficient to state an unclean hands defense; the misconduct must so prejudicially affect the rights of the person against whom the relief is sought that granting relief would be inequitable. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.)

The trial court noted in its statement of decision that it would first address Menefee's unclean hands defense. The court explained: "If Menefee is successful on its unclean hands defense, the court need not discuss the allegations of the Cross-Complaint as Vulcan will be unable to proceed." However, the court ruled against Menefee. Specifically, the court ruled that "the unclean hands defense is unavailable as a matter of law." The court further ruled, in the statement of decision and a subsequent supplemental decision, that the defense failed as a factual matter as well.

In its cross-complaint, Vulcan sought payment for AC from its Sanger plant that Menefee utilized to pave the Academy Project. The County had verified and approved the mix design for AC from Vulcan's Sanger plant for the Academy Project. In turn, Vulcan had provided a certification letter to Menefee confirming that the AC from the Sanger plant, for the Academy Project, would comply with Caltrans Standard Specifications.

As the trial court observed, there were no allegations or evidence of any misconduct by Vulcan in this process. More specifically, there were no allegations, nor was there any evidence, of any problems with the mix design for AC from the *Sanger* plant, used in the Academy Project. Similarly, there were no allegations, nor was there

69.

any evidence, of any deficiencies in Vulcan's certification letter regarding the AC from its *Sanger* plant, for the Academy Project.

Menefee used the AC supplied by Vulcan from its Sanger plant to pave the Academy Project. There were no problems with, or complaints about, the finished pavement. The County did not make a warranty claim on the Academy Project. Menefee got paid for paving Academy Avenue.

The transaction at issue in the cross-complaint was Vulcan's supply of AC from its Sanger plant to Menefee, for use in the Academy Project. As mentioned, there was no allegation of any misconduct by Vulcan in relation to this specific transaction. On the contrary, as the trial court noted, "Menefee unconditionally accepted all of the … asphalt concrete that had been verified and approved by the County of Fresno out of Sanger." The trial court further noted that Menefee, for its part, "has not paid in full for the product it received."

Menefee contends that Vulcan made a misrepresentation in its certification letter concerning RAP AC from its *Fresno* plant for the Academy Project, as found by the jury in the liability phase of the trial on Menefee's claims. However, RAP AC from Vulcan's *Fresno* plant was not used to pave the Academy Project *at any point* and is not the subject of Vulcan's cross-complaint; the cross-complaint pertains to a transaction regarding AC from the *Sanger* plant. We recognize the jury found Vulcan's certification of RAP AC from its *Fresno* plant amounted to a misrepresentation. However, as explained below, the certification letter regarding the Fresno plant did not affect the equitable relationship between parties in the transaction involving AC from the Sanger plant to the point of barring Vulcan's recovery on its cross-complaint.

Vulcan's certification letter regarding RAP AC from its Fresno plant for the Academy Project stated that the material would comply with Caltrans Standard Specifications. Menefee's expert witness on AC, Mark Horn, testified that the RAP AC from Vulcan's Fresno plant, for the Academy Project, did in fact comply with the 2009

70.

version of the Caltrans Standard Specifications. Horn noted that RAP AC was not compatible with the 2006 Caltrans Specifications. Indeed, when Menefee sought a change order from the County with respect to the RAP AC mix design, the County refused to give one as it was satisfied the RAP AC mix design complied with the special provisions of the project contract that addressed RAP AC. In addition, while the test strip laid for the Academy Project with RAP AC from the Fresno plant failed, it failed for compaction reasons (Mike Menefee testified the County used an erroneous method to test the compaction, thereby implying the test strip should not have failed at all). Vulcan, nonetheless, hired Mark Horn at Menefee's request, to formulate a new mix design for RAP AC from the Fresno plant. Through no fault of Vulcan, the County took months to approve the new mix design, requiring Menefee to pave the Academy Project with AC from the Sanger plant.

Given this record, Vulcan's conduct with respect to the mix design for RAP AC from its Fresno plant did not affect the equitable relationship between the parties as to bar Vulcan from recovering Menefee's outstanding payments for the AC from Vulcan's Sanger plant. Menefee ordered, accepted, and utilized the AC from Vulcan's Sanger plant in paving the Academy Project. The County paid Menefee for the project and there were no ensuing problems with the new pavement. In short, Vulcan's conduct with respect to the mix design for RAP AC from the Fresno plant did not so infect the transaction involving AC from the Sanger plant, as to bar Vulcan's recovery on its cross-complaint. (*Carman v. Athearn* (1947) 77 Cal.App.2d 585, 598 ["The misconduct must infect the cause of action before the court."]; *Brown v. Grimes*, *supra*, 192 Cal.App.4th at p. 283 [" '[the] misconduct [of the plaintiff] must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief' "].)

Finally, Menefee has not cited any authorities that persuade us that the unclean hands defense applies here. Menefee relies on *Unilogic*, *supra*, 10 Cal.App.4th 612.

71.

However, the misconduct at issue in *Unilogic* involved improper business practices on the part of the plaintiff—including bribing the defendant's employee and blatantly misusing the defendant's proprietary software—that represented egregious misconduct in multiple facets of the relationship with the defendant. (*Id*. at p. 618.) *Unilogic* does not assist Menefee.

We affirm the trial court's conclusions that the unclean hands defense was not available as a matter of law, and that the unclean hands defense fails on the applicable facts.

Finally, since there is no right to jury trial on equitable defenses, the trial court was empowered to try Menefee's equitable defense of unclean hands itself and properly did so. Accordingly, our remand of this case does *not* encompass retrial of Menefee's unclean hands defense to Vulcan's cross-complaint.

### (iii) The Trial Court Properly Denied Menefee's Request to have the Jury Clarify its Verdict

Menefee argues the trial court should have had the jury clarify its verdict on the Academy Project, regarding what price had been agreed upon for AC from the Sanger plant for this project. This argument is unavailing. Menefee did not request the court to include this question in the verdict form in the first instance. Furthermore, immediately after the jury had rendered its verdict, Vulcan's counsel made exactly this request, which Menefee opposed. Vulcan's counsel requested the court to have the jury clarify its verdict as to the Academy Project, with regard to whether that verdict rested on Vulcan's certification letter or Vulcan's representations regarding the price of AC from Vulcan's Sanger plant. Menefee strongly opposed the request to have the jury clarify the verdict on the Academy Project. Menefee's counsel stated: "[I]t is what it is at this point." Menefee cannot have it both ways. Under the circumstances, the trial court did not err in denying Menefee's request to have the jury clarify the verdict as to the Academy Project.

72.

## DISPOSITION

The judgment on Menefee's third amended complaint is affirmed. The judgment on Vulcan's cross-complaint is reversed and that matter is remanded for further proceedings consistent with this opinion. Each side to bear its own costs on appeal.

SMITH, Acting P.J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.